# EMMET M. COHRON, Executor, et al., v. WILLIAM B. POLK, Appellant.

### In Banc, July 10, 1913.

1. **INCAPACITY: Burden.** Where no confidential relation exists between the parties to a deed, the burden is on the plaintiff, in his suit to cancel and set aside the deed, to prove that the grantor was incapacitated to make it.

2. **————: Absent-Mindedness.** Absent-mindedness in small matters, such as misplacing articles of clothing, riding beyond one's destination on the street car, or on one or two occasions improperly putting on a garment. is not alone sufficient evidence of mental incapacity in a very old person to justify the setting aside of a deed.

3. **————: Opinions.** Opinions of non-expert witnesses that the grantor in a deed was insane and incapacitated to make a deed, must yield to the facts on which they are based, especially if those facts are in conflict with and contrary to the facts on which the opinion is based and do not support it.

4. **————: Setting Aside Deed: Consideration Not Paid.** An aged colored woman without children or other relatives, the owner of a small house in which she lived, one room of which she rented for five dollars per month, after a year's deliberation about selling it and trying to sell it to others, moving in the matter herself, for an expressed consideration of $300, conveyed it to a white neighbor, reserving to herself a life estate, and concurrently therewith entered into a contract with said neighbor and his wife, to whom she was affectionately attached, by which they agreed to pay her ten dollars per month until the whole $300 was paid or so long as she lived, but only the monthly installments of ten dollars should she die before the whole $300 was paid, and if they failed for thirty days to pay any installment after it became due the balance was at once to become due. They had paid only three installments, or $30, when she died. Three years previously she had by will devised it to the trustees of a church, who bring suit to set aside the deed, alleging incapacity and undue influence. She was old and

absent-minded, but if incapacitated it must be inferred from the contract and the relations of the parties. The deed was recorded, and thereafter she had ample opportunity to consult her friends. She continued to live in the house, and to rent one room, and was freed from paying taxes, but was required to keep up repairs. She drew a pension of $8 per month, and on her death-bed told those who stood about her where she had $87 and said it was to be turned over to the grantee's wife, who after she was dead paid $115 in physician's and burial and other expenses. The testimony was that the property was worth from $475 to $900. *Held*, first, evidence not sufficient to show mental incapacity; *second*, no direct evidence of undue influence; *third*, character of transaction not such as to compel or justify deduction of undue influence; and, *fourth*, evidence of the fiduciary relation inconclusive, but if such relation be conceded to exist between grantor and grantee's wife and thereby the burden of proof rested on grantee to prove such relation was not abused, then the evidence meets this test and shows no advantage was taken of grantor, and the deed should not have been set aside. [LAMM, C. J., and BROWN and WALKER, JJ., dissent, in an opinion by LAMM, C. J.]

5. ———: ———: **Extraordinary Power.** The cancellation of an executed contract is an exercise of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case; and never for an alleged fraud unless the fraud be made clearly to appear.

6. ———: **Pleading: Placing Grantees in Statu Quo.** An objection to the introduction of testimony, made orally at the beginning of the trial, on the ground that the petition does not state a cause of action, without a statement, upon invitation from the court, of wherein it is defective, is not looked upon with favor; and a general objection at the trial is disallowed on appeal, if dropped, and a specific objection is substituted. So if on appeal the specific objection, that the bill, to set aside a deed, does not offer to place the defendants *in statu quo*, is substituted for the general objection, it will be disallowed, if from the prayers and offers of the petition it can be legitimately inferred that plaintiff offers to do equity and to make restitution. [Per LAMM, C. J., in a dissenting opinion.]

7. **REFERENCE: Rents, etc.** The court need not refer the whole case to a referee. After hearing the evidence and announcing that the decree will be for the plaintiff, setting aside the deed, a reference may be ordered on the value of rents, betterments, taxes, etc. [Per LAMM, C. J., in dissenting opinion.]

8. **TERM BILL OF EXCEPTIONS: Not Filed in Time: Until Next Term.** Where defendant excepted to the order referring the matter of rents, betterments and taxes to a referee, and took leave to file a term bill of exceptions at the next term, and

at the next term that order was set aside and a new one entered providing that he "had until the May term to file said bill," and the term bill was incorporated with the principal bill and the omnibus bill filed during the May term, on the 57th day, the term bill was not in time, though the order permitted the principal bill to be filed during the term. *Until* does not mean *during;* it means *to* or *till*—the beginning of the May term. [Per LAMM, C. J., in a dissenting opinion.]

Appeal from Buchanan Circuit Court.—*Hon. C. A. Mosman,* Judge.

REVERSED.

*Allen, Gabbert & Mitchell* for appellant.

(1) Defendant's demurrer should have been sustained. Plaintiff's petition was fatally defective in that it did not allege a willingness on the part of the plaintiff to refund to the defendant all money necessary to place him *in statu quo.* Wells v. Mutual Benefit Association, 126 Mo. 638; Jamison v. Culligan, 151 Mo. 416; McKenzie v. Donnell, 151 Mo. 456; Rhoades v. Fuller, 139 Mo. 179. The failure to make such allegation in the petition was fatal as a matter of law and was not cured by verdict of the court. Wells v. Mutual Benefit Association, 126. Mo. 638. (2) Even though the court should find that Mrs. Botts was mentally incapable at the time she made the deed, the court will not set aside the deed in the absence of fraud practiced on Mrs. Botts by the defendant or in the absence of knowledge by the defendant of her condition. There is no evidence of any fraud in this case and no evidence of any knowledge on the part of the defendant of mental incapacity of Mrs. Botts. Rhoades v. Fuller, 139 Mo. 179. (3) A conveyance by person of unsound mind, not under guardianship, if for a valuable consideration, where no advantage has been taken of the grantor, is valid. Wells v. Mutual Benefit Association. 126 Mo. 630; Jamison v. Culligan, 151 Mo. 416; McKenzie v. Donnell, 151 Mo. 454. The evidence in this case shows that a very ample consideration was given by the defendant, and there

is no evidence that any undue advantage was taken, and the great weight of the evidence shows Mrs. Botts to have been a woman of not only sound mind but a very high order of intelligence. (4) The burden rests upon the plaintiffs in this case to prove that the defendant exerted an undue influence over Mrs. Botts and that such influence was exerted at the time of the execution of the contract and deed. Plaintiffs utterly failed in this respect. Hughes v. Rader, 183 Mo. 708; McFadden v. Catron, 138 Mo. 197; Tibbe v. Kamp, 154 Mo. 580; Crowson v. Crowson, 172 Mo. 691. Proof of an opportunity to exert an undue influence or that the defendant had an undue influence over Mrs. Botts was not sufficient. McFadden v. Catron, 138 Mo. 197; Hughes v. Rader, 183 Mo. 708. (5) The court erred in referring this case to a referee as no case authorizing the reference was made by the pleadings. The court should have sustained defendant's exceptions to the report of the referee. The referee in his report charged the defendant with rent during times when the property was vacant and the buildings undergoing repair by the defendant for the purpose of making them habitable. The referee charged defendant with $25 rent due from one Riley Hill, when the evidence showed Riley Hill had never paid such rent and had been ousted by a proceeding in court instituted by the defendant, the costs of which ousting proceeding amounted to $12.60, which had been paid by defendant. The evidence before the referee showed that defendant had expended $520.84 upon this property, which was not disputed; yet, the referee only allowed defendant $470.84. The referee failed to allow many other sums of money which the evidence showed defendant had expended in preserving said property.

*Lucian A. Carter* for respondent.

(1) Where there is a weakness of mind on account of old age and other causes and a right has

been conceded without an equivalent and the duty of care exists, equity will interfere without proof of actual fraud or undue influence. Cadwallader v. West, 48 Mo. 494; Martin v. Baker, 135 Mo. 495; Jones v. Belshe, 238 Mo. 541. (2) If appellant and his wife had been willing to pay the $300 consideration (inadequate though it was) in monthly installments of $10 each, why was the clause inserted cancelling all payments after her death, unless her death was soon expected. At whose suggestion and who was benefited by same unless it was Mrs. Polk? Dingman v. Romine, 141 Mo. 466; McKinoch v. Grooms, 148 Mo. 459; Barkley v. Barkley, 153 Mo. 300. (3) The finding of fact of a court of equity should be deferred to by the appellate courts to a large extent. Johnson v. Realty Co., 177 Mo. 581. (4) A court of record has the power to refer to a referee a matter involving detail such as the examination of accounts, statements, books, etc., or where the taking of accounts would be necessary for the court before judgment, or for carrying a judgment or order into effect; or where a question of fact other than upon the pleadings shall arise upon motion, or otherwise in any stage of the action. R. S. 1909, sec. 1996; Bevin v. Powell, 11 Mo. App. 225.

W. CHRISTY BRYAN, Special Judge.—This is a suit by respondents, claiming under the will of Rachel Botts, deceased, to set aside and cancel a deed made by their said testatrix to appellant, by which, for a recited consideration of $300, she conveyed to appellant, subject to a life estate reserved to herself, the south one-half of lot Six in Block One, Kemper's Addition to the city of St. Joseph, Buchanan county, Missouri.

The grounds on which relief is sought are:

1st. That the grantor, owing to old age and illness did not have mental capacity to make said deed.

2nd. That said deed was procured by fraud and undue influence exerted by the appellant and his wife, and that the alleged consideration was never paid, and was never intended to be paid.

As the petition sufficiently presents the issue it is not set out at length.

The answer admits the ownership of the property involved in the suit in Rachel Botts, January 7, 1907, the date of the deed, pleads the purchase thereof by appellant by deed, in which the consideration was $300, subject, however, to a life estate reserved to the grantor, pleads a contract entered into the same day between the appellant and his wife, as parties of the first part, and Rachel Botts, as party of the second part. It further alleges the payment of three monthly installments under said contract, aggregating thirty dollars, "when the said Rachel Botts suddenly took sick and died after a six or seven days' illness; that the said defendant [appellant] was at all times ready, able and willing to carry out the terms of said contract upon his part, and did all and everything required of him under and by virtue of the terms of said contract."

Appellant further specifically denied the exercise of undue influence "upon the said Rachel Botts to induce her to enter into said contract and to execute said deed, either by himself or by any other person," and alleged "that said sale and said contract was the idea of said Rachel Botts and was her desire, and that defendant was induced against his will to enter into said contract; that the said Rachel Botts at the time of entering into said contract and deed of conveyance was strong and able-bodied save and excepting a lameness in her left shoulder caused by an accident; was unusually bright and intelligent, far above the average of her class; that she left no descendants, and sought by this conveyance and this contract to protect herself against want in her old age and the

cares and worry entailed by the ownership of the property; that all and everything that was done and said in and about the making of said contract, was fairly and honestly done with the only desire upon the part of this defendant or any one acting with or for him to grant the wish and desire of the said Rachel Botts in the disposition of her property and for her maintenance and support."

The evidence showed that the deed and contract above referred to were executed by said Rachel Botts on the 7th day of January, 1907, and the deed recorded January 14, 1907. The will, under which respondents claim, was executed on February 15, 1904, according to the petition (the will was not preserved in the record, but there was no dispute about it). By its terms it left to the respondents the same property that was conveyed to the appellant by the deed. Rachel Botts died April 7, 1907.

The deed was a warranty deed in usual form, so will not be set out. It is sufficiently described in the first paragraph of this statement. It conveyed the property "subject to a life estate, hereby reserved to the grantor."

### CONTRACT.

"This contract, made and entered into this 7th day of January, 1907, by and between W. B. Polk and Lillian S. Polk, parties of the first part, and Rachel Botts, party of the second part, witnesseth:

"Whereas, the parties of the first part are husband and wife, and the party of the second part has this day made to the said husband, W. B. Polk, her warranty deed in and to the south half of Lot Six, in Block One, Kemper's Addition to the City of Saint Joseph, Buchanan county, Missouri, for and in consideration named therein of three hundred dollars; and

"Whereas, the said party of the second part wishes an adjustment of said named consideration, as a sort of a monthly income to her so long as she lives; and

"Whereas, owing to the kindness and affection existing between the parties, it is desired that after the death of the party of the second part, the parties of the first part shall incur no further liability on account of said consideration:

"It is, therefore, by the parties hereto agreed as follows, to-wit: The parties of the first part agree henceforth from date to pay all taxes on said real estate; the party of the second part agrees to keep said real estate in repair out of the monthly rents and profits derived therefrom, and shall cause and incur no expenses or liens, other than taxes, against said property. The parties of the first part hereby agree to pay to the said party of the second part, on the first day of each and every month henceforth, the sum of ten dollars until the sum of three hundred dollars shall have been paid and no longer, in case the said party of the second part shall so long survive. In case that the said party of the second part should die before the said amount of three hundred dollars is paid, in monthly installments of ten dollars per month, then the balance, if any, between the total of the amount so paid in installments and the three hundred dollars consideration is thereby paid, the contract of the parties hereto being that the parties of the first part shall pay three hundred dollars in ten-dollar installments, monthly, to the extent of three hundred dollars, in case the party of the second part so long survives, but should she sooner die, shall only pay ten dollars per month so long as the said second party shall live; in either event, the fullfillments of said payments in accordance herewith by the parties of the first part, shall be full consideration and liquidation of said three hundred dollar debt. If the parties of the first part shall fail to make any one monthly payment for a period of thirty days after the same is due and ought to be paid then the whole of the amount of said three hundred dollars still owing in case the said party of the second part shall be living shall become due and payable, and an action for the whole of the balance of said amount will at once lie.

IN CONSIDERATION WHEREOF, the parties hereto have signed their names the day and years first above mentioned, in duplicate.

her<br>RACHEL X BOTTS<br>mark.<br>W. B. POLK.<br>LILLIAN S. POLK.

Witnesses to mark

　Mrs. T. L. PEPPERELL,

　T. L. PEPPERELL.

The appellant W. B. Polk, the grantee in the deed and one of the parties of the first part in the contract, is the husband of Lillian S. Polk, so frequently referred to in the evidence and the other

party of the first part in said contract. As the parties and the trial court treated them practically as both parties to the deed and contract, we likewise do not make a distinction.

The evidence as to Rachel Botts's age is conflicting, her age varying by almost twenty years, according to different statements. The respondents' witness Cohron stated she was between eighty or ninety, while the witness (also respondents') who had known her longest, to-wit, Harvey Montgomery, testified that in 1847, when he was sixteen, she must have been nineteen or twenty; this would make her seventy-nine or eighty.

The respondents' witnesses, testifying to her mental capacity, testified largely by conclusions. The witness Cohron stated: ''She was easily confused and very—well, very forgetful. . . Seemed to show a good deal—well didn't know just what to do with herself and with things; she was bothered about her business. Seemed to have an unsettled mind as to what was the best thing to do.''

''Mr. Gabbert: We object to conclusions.''

When pressed for a specific illustration he testified: ''Well, now, with reference to her property; *she told me she wanted* to sell her place; that she had been offered $300 for it. . *The next time* I saw her she said *she was going to sell* it; and *and when I saw her again* she said that the parties would give her $500 for it. They was to give her $300—I don't think she knew just what she sold the place for. Then she said the parties thought we would buy it, and when I saw her she said that the parties were continually after her about it, and kept her so confused about it that she didn't know just what to do.''

If these facts, as distinguished from the opinion of the witness, are true, and there was no evidence introduced to the contrary, they are not evidence of incapacity, but, on the contrary, to our mind show that she considered not once but several times the

question of selling her property; that she had several offers for it, and was in doubt—the same kind of doubt that any one might be in—as to which was the best deal for her to make. This statement on three separate occasions also shows a fixed intention of selling.

This witness also testified that Mrs. Polk, after Mrs. Botts's death, assumed the doctor's bill of thirty-eight dollars, the undertaker's bill of sixty-three dollars, the druggist's bill of four dollars and something, and the nurse's bill of ten dollars, aggregating more than $115.

Another witness for respondents, Mrs. Sarah Wilson, testified: "She" (meaning Mrs. Botts) "complained of her head *just before she died,* and had rheumatism a good deal." (The italics are ours). . . "Mrs. Botts complained of having rheumatism the whole time I knew her, fifteen years."

This witness also testified: "Well, sometimes she would say she wanted the church to have it (meaning her property] *and sometimes she wanted somebody else to buy it; she* rather deferred to Mrs. Polk; *she insisted upon Mrs. Polk buying it.* . . . She said that Mrs. Polk knew her and *was a good friend of hers.*" (The italics throughout the statement are ours).

This testimony of respondents' witnesses also shows that Mrs. Botts was the one who desired the sale, not Mrs. Polk. Further Mrs. Wilson's testimony is:

"Q. How often was Mrs. Polk there? A. I don't know just how long. It was every day during her illness."

This evidence affords a reason for the third premise in the contract relating to the consideration of kindness and affection.

This witness testified: "I found her [Mrs. Botts] being lost once, and she told me of being lost the second time. . . She was just this kind of a person;

Cohron v. Polk.

she was old and feeble; she didn't know one car from another; if she didn't take care, she didn't know where to get off. . . Q. She always had to have somebody go with her? A. *No, sir.* Q. Grandma *wouldn't trust Cohron* and these other trustees and only *trusted Mrs. Polk?* A. She seemed that way; I don't know. . . Q. Grandma had saved $87.50 in money, hadn't she at the time of her death? A. I think she did. Q. Were you there at that time; at the time of her death? A. Yes, sir. Q. She turned that money over to Mrs. Polk? A. *She turned that to be put in the bank;* that is what she said; *I heard the conversation.* Q. She said often that she would will this property to the church; but she had a notion to sell it? A. I don't know whether she had a notion to sell it or not. She said that the parties that wanted her to sell it might beat her, maybe. Q. If anybody wanted to buy it, she wanted Mrs. Polk to have it? A. She didn't exactly say that; she wanted *Mrs. Polk to buy the place;* she said that *she wanted Mrs. Polk to buy the place.* Q. Do you think she was insane because of making that statement after she willed the property to the church, then she intended to sell it? A. Well, I wouldn't say exactly insane; but she was like most old people, her mind was very easily overpersuaded by some one else.''

This by another of respondents' witnesses shows also two things: 1st. That Mrs. Botts wanted to sell the property, and, 2nd, that she wanted Mrs. Polk of all people to have it.

Mrs. Lizzie Allen, another witness for respondents, iterated and reiterated, ''She [meaning Mrs. Botts] didn't have mind or memory,'' but when pressed for specific instances testified that Mrs. Botts once made a mistake regarding the denomination of a bill.

''The Court: Tell me something that she did. A. Well, in money line, when I would come back, she

would say it was a two-dollar bill, and I had changed it and handed back the change to her; 'Mrs. Allen, you give me too much money.' I said, 'You give me a five-dollar bill.' 'I didn't, I give you a two-dollar bill.' 'Well, did you have paper or five dollars in change.' So she felt like she had only—she didn't give me five dollars; she kept that; but she give me a two-dollar bill; she thought it was a two-dollar bill that she gave me.''

This shows, too, the grantor knew how to correctly count money and the correct change due from the different bills, even if she had mistaken one bill for another.

''A. *She often went by herself;* go down town and she would walk down and I would say, 'Grandma, why didn't you ride back; you walked down,' and Grandma would say, 'I aint got any memory;' she would not know what car to take to get on the car; or she would say, 'I got lost.' She never would tell me unless she got lost and I would scold her about it. She didn't have mind or memory.''

This same witness testified that she remonstrated with Mrs. Botts about going out with what she considered insufficient clothing, and thereupon ''she would get her shawl and put it around her.'' On cross-examination, however, this witness testified that Mrs. Botts took in washing, did her own work, and in fifteen years the witness went only four times with Mrs. Botts to collect her pension. She also testified:

''Q. Now, how did you know that her time had come to draw her pension? A. *She told me when it was time.* Q. *She came and told you it was pension day?* A. *Yes, sir.* . . . Q. I am talking about her memory; I am talking about her failing mind; did you know of her acting crazy? A. *No, sir.* Q. Was she considered in that community at that time— Did you ever hear that she was a crazy old negro? A. *No, sir, I never heard she was crazy.* . . Q. She

always remembered pension time, didn't she? A. Sometimes she would; and sometimes she wouldn't. Q. When was it that she did not? A. I said once, 'Grandma is today pension day?' she says, 'No.' 'Not the 4th when you draw your pension?' She says, 'Yes.' 'How often do you draw it?' 'Every three months when I remember.' 'It has been over three months now.' 'Well,' she says, 'The doctor hasn't done it.' Q. She always left it with Dr. Crossland? A. Yes; always go out for her. Q. She remembered it was the 4th all right. A. Yes, the 4th. Q. And remembered that Dr. Crossland attended to her business and he hadn't been down there to see her? A. Yes, sir. Q. This was pension day? A. Yes, sir. . . Q. It was her pension day? A. Yes, sir. Q. She knew what day of the week and what day of the month? A. Yes, sir. Q. Well, Grandma rented these two rooms to Riley Hill? A. Yes sir. Q. Collected the rent for the rooms? A. Yes, sir. Q. Did her own washing? A. Yes, sir. Q. Made her own living? A. Yes, sir. Q. Did her own cooking? A. Yes, sir. Q. Lived alone? A. Yes, sir. Q. Up until the time of her death? A. To her death. Q. And she trusted in—and had faith above every one else in Mrs. Polk? A. Yes, sir. Q. She said that, didn't she? A. Yes, sir. Q. She said that didn't she? A. She said that Mrs. Polk was her friend. . . Q. Grandma was washing until about two weeks of her death, wasn't she? A. She washed that week for Mrs. Polk.''

Mrs. J. T. Wilson, on cross-examination testified: "Q. You think she was insane? A. I don't think Mrs. Botts was insane; I know Mrs. Botts was old; I think about eighty-nine years old; somewhere along there; I called on her before she was very weak and I have gone to the door and have stayed with her a while. Q. She was afraid? A. No, she was not

afraid, naturally just a little nervous. Q. She would send for people to read her tax bills; she could not read and she was afraid somebody would beat her? A. If she didn't know people. She always turned to me. Q. How many other things did you ever read to her? A. I have read her letters considerable times. Q. Read them over to her several times? A. Only *had to* but *once*. . . Q. She understood what a tax bill was? A. She knowed it was a back tax, I suppose."

This same witness testified that Mrs. Botts once was out in a pouring rain with a parasol which she had not raised. "Q. Grandma always knew you, didn't she? A. Yes, she always knew me; I am not saying that Mrs. Botts was insane; I say that she was a child in age; she had gone back to her childhood; anybody could persuade Mrs. Botts to do anything. Q. How do you know? A. Well, because I have talked to her of things, concerning her property; I would come over and she would be ironing napkins and she would be complaining, maybe, two or three days about taking medcine; 'Why do you do this, you have got a pension; you are not compelled to do this?' 'I have always worked, and if I didn't do it, I believe I would get so I wouldn't get up;' I said it is injurious to you; if I was you I would sell my property and live off the money. She says, '*I have got no child in the world to give it to—no relative to give it to;* I want the church to have my property;' she says, 'Of course I could sell my property, I want to get the cash money.' What was done afterwards, I don't know. Q. That doesn't show that anybody had influenced her; you say that she was easily influenced and you tell of these transactions that shows a pretty wise head so far as influencing her to do things; do you know of any incident where any one influenced her to do anything? A. *I don't know of any incident;* I can't remember. Q. You cannot re-

member an instance? A. All I know — Q. Do you know of a *single instance* where any one ever influenced her to do anything — one incident; when anybody influenced her to do anything? The Court: Do you remember of *an instance?* A. *No, sir."*

Riley Hill, another witness for the plaintiff, testified about the same as Mrs. Wilson. He added that sometimes Mrs. Botts was nervous and had difficulty in dressing herself because of her shoulder. Got her own meals and sometimes got his.

Mrs. Mary Harvey tetified Mrs. Botts discussed with her the question of building a double tenement on her property; and that Mrs. Botts, with the alternatives in her mind of giving the property to the church or to the old ladies' home, said she believed *she would sell the property.* (Italics ours).

Dr. Crossland testified: "Mrs. Botts during the last year and a half of her life was very feeble; memory was not good; she was not in the best shape mentally; she had suffered with a stroke of paralysis. She finally had an abscess on the brain and died of paralysis of the brain—apoplexy. Q. As physician, and acquainted with her and acting as her attending physician, I will ask you, whether in your opinion, she was capable of transacting business, such as making a sale of real estate and getting the money consideration for it on January 7, 1907? A. That was a month or two before she died. I should not judge she was. I do not think she would be."

On cross-examination, however, he testified:

"Q. Now, upon what do you base your statement she would not have knowledge enough to sell her property and receive the money for it? A. Well, I will tell you; she said to me several times prior to that that she was going to give her property—to let the church have it—take care of some old people, and then about January, 1907, or possibly before that or a little after that, *she said to me, she wanted to sell the property;*

wanted me to buy it for $475; I said to her, 'Now, I
don't want this property, and unless you can go and
get a brother belonging to the church that you can
deal with—to agree upon it, that you know can take
it alone—I knew in my position with her if I would
bought the property, I would get in a box. Q. When
did you get in trouble with the church? A. Well, I
knew she had stated that she wanted the church to
have it; and I told her that she could not sell it to
me; and she said she didn't think about that or made
some kind of a reply; I wouldn't have anything to do
with it."

The evidence also showed she received five dol-
lars a month for rent of rooms to Riley Hill and a
pension of twenty-four dollars quarterly.

Respondents offered no evidence as to the testa-
trix's mental condition at the time she executed the
deed and contract.

The testimony quoted has been that of the respon-
ents' witnesses. We have not attempted to give it all,
but it was all of the character as that given, and we
have given a fair sample of it.

The testimony of the appellant supports the an-
swer and was to the effect that the testatrix was a
woman strong mentally and physically, shrewd about
money matters, and had always been able to support
herself and conserve her property. It coincides with
and confirms the testimony of the respondents to the
effect that Mrs. Botts was anxious to sell the prop-
erty, and that she was anxious for Mrs. Polk to have
it, and that the idea of selling it to Mrs. Polk was
her own. Appellant's testimony also shows that Mrs.
Polk had been her friend for fifteen years; had nursed
her and fed her when she was sick; was with her dur-
ing her last illness; was the one Mrs. Botts, when
on her death bed, singled out among the women pres-
ent to whom she turned over eighty-seven dollars that
she had in her pillow, and confirms and corroborates

the respondents' witnesses who said that Mrs. Botts gave the money to Mrs. Polk. Thus showing that Mrs. Botts even *in extremis* was perfectly lucid and knew where she kept her money, how much it was, what she wanted done with it, and to whom she would entrust it. The notary and witnesses present at the execution of the deed and contract testified she thoroughly understood them and said they were just what she wanted.

This case is distinguishable from the case of Jones, Exr., v. Belshe, 238 Mo. 525 l. c. 540, relied on by respondents. There the testator left descendants, did not know the defendants, who were newcomers in the town and not related to him, and were strangers to him until he went to their hotel to board. He made the deed to them when practically in their custody, and, when rescued from them, repudiated the deed under which they claimed. In the case at bar, Mrs. Botts never lived with Mrs. Polk, and never was in her custody, and the evidence clearly shows that the making of this deed was not the result of temporary caprice or of a fleeting intention, but that she had discussed it (and the respondents' own evidence shows this) for. more than a year with various people and on different occasions when neither Mrs. Polk nor any of her friends was present, thus indicating a fixed intention on her part "of long standing to convey the property in the way she did." [Jones v. Thomas, 218 Mo. 508.]

Setting
Aside
Deed:
Incapacity:
Fiduciary
Relation:
Fraud.

It was said in the case of Jones, Exr., v. Belshe, supra, quoting Martin v. Baker, 135 Mo. l. c. 503:

"Wherever two persons stand in such a relation as that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other,

and this confidence is abused, or the influence exerted to obtain an unfair advantage at the expense of the confiding party, the person so availing himself of the position will not be permitted to retain the advantage, although the transaction could not have been impeached if no confidential relation existed.''

It is also said that where a confidential relation is shown to exist between parties to a contract, the burden of proving the *bona fides* of the contract is on the beneficiary thereof. [Ibid., citing cases.]

And again:

''A contract, therefore, by one of impaired mental and will power with one standing in confidential relations with him should be closely scrutinized to see that no improper advantage has been taken or undue influence exerted. The exertion of undue influence in such case may be pronounced from the nature of the contract, and from an unfair and unreasonable advantage secured by it.'' [Jones v. Belshe, supra, l. c. 540.]

Where no confidential relation exists the burden is on plaintiff to prove that the grantor in the deed was incapacitated to make it. [McDermeitt v. Keesler, 240 Mo. 278, l. c. 290.]

There was no *direct evidence* of undue influence, and if it cannot be inferred from the deed and contract and the relations of the parties, there is none of any kind at all.

Even if we concede for the sake of argument that a confidential relation was shown to exist between the testatrix and Mrs. Polk, and that *she* and *Mr. Polk were* the *beneficiaries* of the transaction, and *Mrs. Botts was not,* still we think the respondents' evidence *affirmatively* refutes the charge and rebuts the inference that there was any undue influence exerted by Mrs. Polk, Mr. Polk, or any one for either; or even that they wanted the deed made. On the contrary the

testimony of *respondents' own witnesses affirmatively* shows that Mrs. Botts was the moving party.

We are by no means prepared to say that the contract itself is of such a character that on its face it challenges the criticism of a court of equity, or even that it was a bad one for Rachel Botts. To our mind there may well be two opinions about it. One or two of the respondents' witnesses testified they had advised Mrs. Botts to sell the property. She had offered it (presumably the entire interest in it) to Dr. Crossland for $475. According to a real estate man the value of it in its then condition was between eight and nine hundred dollars, but experience shows that there is a wide difference between what one can get for property when forcing it on the market and what a real estate agent says it ought to bring. If Mrs. Botts had sold the property outright to Dr. Crossland for $475, or to some one else for $900, she would have been without a home; while by selling it as she did (and she only sold the remainder)—or giving it, if you please —to her friend Mrs. Polk, she insured herself of an increased income of ten dollars a month for thirty months (making $300 if she lived so long), freedom from harassment for taxes, and enjoyment of the property for the rest of her life, together with the rents she might collect from other occupants. She evidently believed she was making a good bargain, for it was the one she preferred to make, after deliberating about the matter for more than a year. She had "ample opportunity to consult her friends," and did consult them and there was "sufficient" *locus penitentiae*. [McClure v. Lewis, 72 Mo. 314; Gibson v. Jeyes, 6 Ves. 278; Evans v. Llewellin, 1 Cox Chan. Cas. 333.] Then, too, her contract was made with a person who, she was morally certain and satisfied, would carry it out according to its spirit, and thus her mind could be at rest. The *"delectus personae"* had and rightly had not a little to do with it. That she died after re-

ceiving only three payments no more warrants the setting aside of the deed at the instance of the grantor's devisees than if she had lived twenty years would have warranted the setting aside of it at the instance of the grantee, the refunding of his money and taxes with interest and relief from further obligation because of his deferred enjoyment for that length of time.

Parenthetically, the respondents seem to ignore the fact that only the remainder, and not the entire estate was sold. The deed was on record for nearly three months before the grantor died. She never complained of it nor wanted to recall it.

The contract shows that a part of the consideration therefor was love and affection, and the constant and never-failing kindness and generosity of Mrs. Polk to the grantor afforded ample reason for this feeling. Even after Mrs. Bott's death Mrs. Polk assumed, according to the Rev. Cohron's testimony, $115 of her debts.

Had Mrs. Botts had any relatives, the natural objects of her bounty—and she realized she had not, and commented on the fact more than once—and had she given the property away from them without mentioning them, there might be more reason for questioning the transaction with Mr. and Mrs. Polk.

Evidence that a person has misplaced or occasionally misplaces articles of clothing while dressing —or even on one or two occasions improperly put on garments—or sometimes, in the *opinion* of one *witness,* went out insufficiently protected against the cold, but on reference being made to it immediately repaired to her home and put on a proper wrap—or once or twice mistook the denomination of a bill—especially when unable to read—but at the same time recognized the difference between the change and correctly understood the change for the respective bills under discussion—or on one occasion rode beyond her

destination on a street car—is not alone sufficient evidence of mental incapacity to justify the setting aside of a deed. Some of the ablest and strongest-minded persons are notoriously absent-minded in these small matters, and if evidence of this kind were sufficient, they could be convicted of incapacity.

The evidence of respondents' witnesses in favor of respondents' claim is largely opinion evidence, but whatever its value, opinion must yield to the facts on which it is based, especially if those facts are in conflict with and contrary to that opinion and do not support it. In Crowson v. Crowson, 172 Mo. 691, l. c. 702, it was held that opinions of non-experts not predicated on facts were not sufficient to show incapacity.

While we are mindful of the doctrine that deference is due to the findings of the chancellor (Huffman v. Huffman, 217 Mo. 182; Johnson v. Stebbins-Thompson Realty Co., 177 Mo. 581, and others), "under the practice in Missouri equity cases are substantially triable *de novo* in the Supreme Court," and such court "while deferring somewhat to the conclusions of fact reached by the trial courts, has not been bound by its findings of fact nor its conclusions of law thereon, but has ever exercised a supervisory control over both." [Blount v. Spratt et al., 113 Mo. 48.] "If its findings and judgment" are "not sustained by the evidence and law, then this court" will "proceed to make its own finding and enter judgment as equity and justice might require." [Givens v. Ott, 222 Mo. 395, l. c. 410.] "Otherwise, appeals in chancery causes would be idle formalities." [Gottfried v. Bray, 208 Mo. l. c. 663.]

"In general, the cancellation of an executed contract is an exertion of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear." [6 Cyc.

336, citing cases, among others, Jackson v. Wood, 88 Mo. 76; Bryan v. Hitchcock, 43 Mo. 527.]

The evidence falls far short of meeting this test even were the complaint made by an heir, *a fortiori* when we consider it is lodged by a volunteer.

Applying the above rules of law to the evidence in this case, we think the deed should not have been set aside.

There were other questions raised by the appellant, but in view of our opinion on the merits it is not necessary to decide them. The judgment should be reversed. *Graves, Bond* and *Faris, JJ.,* concur; *Lamm, C. J., Brown* and *Walker, JJ.,* dissent in a separate opinion by *Lamm, C. J.; Woodson, J.,* not sitting.

## DISSENTING OPINION.

LAMM, C. J.—In September, 1908, Cohron, executor of Rachel Botts's will, together with the trustees of the Francis Street Baptist Church of St. Joseph, a corporation (said church also joining as plaintiff) brought suit in equity in the Buchanan Circuit Court against W. B. Polk to set aside a warranty deed of date January 7, 1907, whereby Rachel purported to convey a lot she then owned to said defendant for a consideration of $300, reserving to herself a life estate.

The bill set forth that the property had been devised to the trustees of said Baptist Church by Rachel's will, duly executed in February, 1904, and duly probated on her death in April, 1907; that it was worth $1500; that Rachel at the date of the deed was upwards of eighty years old and could neither read nor write; that she was, by virtue of her dotage and from being sick in body and mind, incapacitated to make said deed at that time; that she was flattered and unduly influenced to make the same by defendant and his wife, Lillian, she having trust in their statements

and promises to take care and provide for her and her interests and that it was for her good and the best for her to make it, and was prevailed upon to sign the deed by mark without knowing the effect of her act. That no part of the expressed consideration in said deed had been paid; that defendant had collected rents amounting to $300 and should be required to account for them and to show in turn what he had expended on the property, if anything; that the deed should be canceled and for such further and other orders and decrees as were just and proper.

From a decree in favor of plaintiffs setting aside the deed, but decreeing a lien in favor of defendant for $334.84, he appeals.

The allegations of the bill sufficiently appear above.

The answer admits Rachel's ownership of the lot prior to January 7, 1907, her conveyance of that date as alleged and her death. It alleges that $300 was a sufficient consideration for the lot. It also pleads a written contract of the same date between defendant and his wife on one side and Rachel on the other, narrating (in a whereas) that Rachel wanted an adjustment of the consideration in such manner as to produce "a sort of monthly income to her so long as she lives." In another "whereas" it is set forth that because of the kindness and affection between the parties it was desired that on the death of Rachel during the life of the contract, Mr. Polk and his wife should incur no further liability on account of said consideration. To that end it was agreed in the contract that Polk and his wife should pay the taxes on the lot from that date onward, that Rachel should keep the real estate in repair out of the monthly rent and profits, should incur no expenses and cause no liens against the lot and that Polk and his wife should pay her ten dollars per month until the $300 were paid, this, however, in the event she lived that long. If she did not

live that long then the obligation to pay should cease at her death and the amounts paid should be a full consideration for the $300 debt. The contract further provides that if defendant defaulted on the monthly payments, all of them became due and an action would lie for the whole sum. Having pleaded said contract *in haec verba,* the answer proceeds to allege that the monthly payments were made for three consecutive months; that at the end of that term Rachel took suddenly sick and died; and that the contract thereby became fully performed on the part of defendant. Denying any undue influence by defendant (or any other person in his behalf) the answer alleges that the sale and contract were the idea of Rachel alone; that *"she induced defendant against his will to enter into said contract;"* that Rachel was at the time strong and able-bodied, except a lameness in her left shoulder caused by an accident some years before, and (quoting) "was an unusually bright and intelligent negress, far above the average of her class;" that she left no descendants; that she sought by the conveyance to protect herself against want in her old age and care and worry over the ownership of the property; and that the transaction was a fair one, honestly done in order to subserve the wishes of Rachel, as aforesaid.

Such of the evidence as we deem vital to assignments of error will be noticed presently in its place.

At the close of the evidence offered on the merits at the trial, the chancellor announced his intention to find for plaintiffs and thereupon he entered an order appointing Lawrence Bothwell, Esq., of the St. Joseph Bar, referee to take further evidence and make a finding on rents on one hand, and the improvements and betterments, etc., made by defendant, on the other. To that order defendant excepted and took leave to file a term bill at the next term. At the next term this order was set aside and a new one entered providing that defendant "had *until* the May term to file said bill of ex-

ceptions." The term bill was incorporated with the principal bill and filed *during* the May term, on its 57th day.

(*Note.* There is no question but what the principal bill was filed in time.)

When the trial commenced defendant objected to the introduction of any evidence "for the reason that the petition does not state facts sufficient to constitute a cause of action." Thereupon, the following rather significant colloquy occurred:

"*The Court*: Do you wish to argue the objection?

"*Mr. Gabbert* (attorney for defendant): No, sir, not at this time.

"*The Court*: Objection overruled."

Presently, the cause having been held *sub judice* for his report, the referee qualified and took on himself the burden of service. Taking testimony, he reported it with his findings. Defendant's exceptions thereto, coming in, were overruled and he saved the point.

In substance (condensing them) the assignments of error are: (1) The bill did not state facts sufficient to constitute a cause of action; (2) it was error to appoint a referee (and herein of error in overruling defendant's exceptions to the referee's report); (3) on the merits the decree should have been for defendant.

I. *Of the sufficiency of the bill.*

The point made against the bill in appellant's brief is that it was "fatally defective in that it did not allege a willingness on the part of the plaintiff to refund to the defendant all money necessary to place him *in statu quo.*"

(a) The point thus made directs this court to an alleged specified vice; whereas the point made below did not. Below, the point was under cover of the statutory general ground of demurrer. Learned counsel

possibly was entitled to make his point against the bill in the general language of the statute regulating a general demurrer (R. S. 1909, sec. 1800), if he chose to take that course. That is frequently done in practice, but it should not be favored; for it smacks of ambush and lying in wait when made in that form at so late a step in the evolution of a lawsuit. Moreover, when he was asked by the court whether he wanted to argue the point, that request was equivalent, in a forum of reason, to an invitation to point out the specific infirmity he had in mind, to let fly his arrow of criticism, if any in his quiver, at a definite mark—this, for the edification of the court. When he declined so to do was not that declination tantamount to notice that he preferred his exact position to remain dark for trial purposes? If not that, did it not mean that at that time he had no specific objection in mind but was casting an anchor to windward for tactical purposes further on in the case, should a specific objection spring up in his mind later on being more fully advised? The rule is to disallow a general objection to testimony below, where, on appeal, the general objection has been dropped and a specific objection substituted. [Bragg v. Railroad, 192 Mo. l. c. 342-3; *Ibid.*, 345-6.]

From the trend and thread of the discussion in the Bragg case and cases cited, it is a bit hard to escape the conclusion that the reasoning applicable to the rule governing a general objection to testimony applies to a general objection made orally to a petition at the commencement of the trial, where, as here, the lower court (asking for light) was left in the dark on the point. We say so much by way of admonition, the question is reserved, as at this time a ruling is not necessary to our case, as will presently appear.

(b) While a defendant may object orally to the sufficiency of a petition when the trial is about to begin by introducing testimony, yet for obvious reasons such course is not favored by courts. The fair (hence,

proper) way is to challenge the sufficiency of the peti-
tion by demurrer in the beginning so that if it is held
insufficient, and be susceptible of amendment, the bill
may be cured before trial. [East St. Louis Ice & Cold
Storage Co. v. Kuhlmann, 238 Mo. l. c. 702, et seq., and
cases cited.] Where the challenge is made orally,
when the trial is called, and is overruled, the right doc-
trine on appeal is that the grace of every implication
is allowed to aid the judgment precisely as in a mo-
tion in arrest after verdict—i. e., mere uncertainty,
indefiniteness or informality in allegation is not fatal.
"Such objection is disallowed if by reasonable intend-
ment, or by fair implication from facts stated, or if
by most liberal construction the essential allegation
may be got at by inference." [*Ibid.*]

(c) Applying the doctrine announced in para-
graph *b,* the point should be ruled against appellant.
This, because:

There is a cardinal maxim of equity that he who
seeks equity must do equity. It has been held in some
cases cited in appellant's brief that a plaintiff in his
bill should aver his willingness to do equity or his
ability to make restitution or to pay the price of his
decree by putting a defendant *in statu quo ante* in
cases where rescission is decreed. But it could hardly
be held good equity to rule that a plaintiff who was
unable to pay in specie the amount necessary to put
defendant *in statu quo ante* should be cast, when it is
apparent on the face of the bill or from the facts that
defendant can be made whole out of the real estate in
dispute by decreeing a lien as the price of the decree,
as was done in this case. So, admitting for the pur-
poses of the case that a bill should show a willingness
to do equity on the part of the one who seeks equity,
yet we think this bill indicates an equitable frame of
mind and disposition. Plaintiffs ask for rents on the
one hand, and, on the other, for a showing on improve-
ments, betterments, etc. That means a disposition to

do equity—to give and take on equitable principles. They follow this by asking for such orders and decrees as may do equity. That was the theory of the trial chancellor when he ordered a referee to take an account of taxes paid and improvements done to the property on the one side and ascertain rents on the other side.

Says Story with a fine animation, native to him (1 Eq. Juris. [13 Ed.], sec. 439.): "The beautiful character or pervading excellency, if one may so say, of equity jurisprudence is, that it varies its adjustments and proportions so as to meet the very form and pressure of each particular case in all its complex habitudes."

That a chancellor *sua sponte* may put a price upon his decree, though that price be not specifically offered in plaintiff's bill, is held in a line of cases. [Whelan v. Reilly, 61 Mo. 565; Paquin v. Milliken, 163 Mo. 79; Haydon v. Railroad, 222 Mo. l. c. 134, et seq.] In a well considered case from Indiana (Shuee v. Shuee, 100 Ind. l. c. 481), cited in the Haydon case, supra, there are remarks apposite, viz.:

"It is urged that the court below should have sustained a demurrer to the bill, because it failed to show an offer to rescind on the part of the plaintiff before filing the bill, and it is argued that because it appears from the facts as found by the court, that no offer to rescind was made, nor to return the money paid as the consideration of the settlement, before the suit was commenced, the court could make no decree in the plaintiff's favor setting aside the settlement. It is always within the power of a court of equity, where its decree is invoked, to require, as 'the price of its decree,' that the person invoking it shall submit to equitable terms, and accordingly a chancellor always inquires concerning the equities which the plaintiff must do, in order that he may be entitled to the relief which he seeks. Whenever any benefit has been received un-

·der a contract which the court is asked to set aside,
the court will fasten a trust on the conscience of the
party, in respect of such receipts, and direct an ac-
count and repayment.''

The premises considered, while the bill is inartifi-
cially drawn in the particulars in hand, yet (aided by
legitimate inferences, as it is) we should not hold it
bad, where its sufficiency was not challenged by a de-
murrer but by an objection sprung at the trial to the
introduction of testimony, and where, as here, the
specific vice complained of was not brought into the
open on the request of the court but, *ex industria,* was
screened by the shade of a generality.

II. *Of the appointment of a referee (and herein
of exceptions to his report).*

(a)    Section 1996, Revised Statutes 1909, *inter
alia,* provides for a referee ''to report upon any spe-
cific question of fact'' involved in a cause subject to
reference.  The court need not refer the whole case,
and we see no reason why a reference might not be
ordered on the value of betterments and on taxes,
rents, etc.  That course, *nisi,* is not unusual and seems
a sensible aid in administering equity.  We should
hold the reference well enough.

(b)    Furthermore, the assignment of error should
be disallowed because:    There were two bills of ex-
ceptions due when the case closed—one, a term bill for
which leave had theretofore been taken to preserve de-
fendant's exceptions to the appointment of a referee,
the other, the main bill.    At the proper term for filing
the term bill, the prior order granting such leave was
set aside, and defendant was allowed ''*until* the May
term to file said bill of exceptions.''    He filed an omni-
bus bill on the 57th day of the May term—in time for
the main bill.    We do not hold he could not inorporate
the term bill in the principal bill, provided his leave to

252 Mo.—19

file the term bill had not expired when the principal bill was filed. But in this case that leave had expired. Certainly neither the preposition "until" nor the conjunction "until," in fair English meaning, is equivalent in correct usage to "during" or "throughout" or "at," or such phrase as, "while the term lasts. As a preposition "until" means, to; up to; till. As a conjunction it means, as far as; to the place or degree that; to the time that; till. [Web. tit., "until."] That standard work in a note says: "In ordinary uses as well as in contracts and other legal documents the question as to whether 'until' is inclusive or exclusive of the date mentioned generally depends on the connection or circumstances in which the word is used. The weight of judicial decisions is that 'until' is prima facie exclusive." Speaking of the word "until," it is declared to be "a restrictive word; a word of limitation; construed in contracts and like documents as exclusive of the date mentioned, unless it was the manifest intention of the parties to include it. But this construction is not of universal application, and the effect to be given this word must depend on the intention of parties using it, as manifested by the context and considered with reference to the subject to which it relates." [39 Cyc. 841-2.]

In Railroad v. Gracy, 126 Mo. l. c. 477 et seq., there is a discussion of the office and meaning of "until." That case may be considered authority for the proposition that if a day certain has been named for filing the bill of exceptions, the word "until" (when read in the light of the context from which the intent may be gathered, and the statutory rule for computing time) might be held to include a day mentioned. But in this case that rule does not apply, for there is no day mentioned. So, too, the context is against the construction that the whole or fifty-seven days of the May term were meant. Nor does the obvious intent of the order lead up to any other conclusion—*ex. gr.*,

the term bill of exceptions would be a small affair, requiring little time in preparation. Not so, the principal bill. Accordingly the order granting leave for both bills, as preserved in the abstract of record entries, reads:

"Defendant has leave to file bill of exceptions *during* the next May term of court." (That is, his principal bill.) "Now here the order heretofore made in this cause, allowing defendant to file term bill of exceptions is set aside and defendant has *until* the May term to file said bill of exceptions." (The italics, of course, are ours.)

There is a different wording to the order given in the bill of exceptions, but that we may not look to for record entries.

Giving that order the value its face imports, it will be seen that when defendant desired leave for filing his principal bill, the leave he took was "during" the May term. But when he came, in the next line or so, to his term bill he dropped the word "during" and substituted one filling a different office, to-wit, "until." If that word be allowed to be of such ambiguous or equivocal meaning that the intent must govern in each particular case, then the context indicates an intentional change in phraseology—a change unfortunate if the leave was to be the same for the term bill as it was for the main one.

(c) Error is assigned for that the court overruled defendant's exceptions to the referee's report. The principal item now complained of is that the referee erred in recommending the twenty-five dollars rent uncollected from one Riley Hill should be charged to defendant. It seems that Hill was allowed to occupy one house on the lot free of rent for several months—that is, none was collected from him although he was allowed to remain until finally put out later by legal process. But an examination of the decree shows that the court did not give judgment for this item. In such fix,

although the court may have erred in fully confirming the report (a question we do not .decide) yet that error, if any, did not result in injury to appellant on the Hill item. It may be if plaintiff had appealed they .could have complained of -the decree in that particular, but appellant cannot. We are forbidden to reverse judgments in civil actions unless for error that affects the substantial rights of the adverse party. [R. S. 1909, sec. 1850.] Error to be reversible is error materially affecting the merits. [*Ibid.*, sec. 2082.]

My Brother GRAVES, in Trainer v. Mining Co., 243 Mo. l. c. 374, in a concurring opinion, was of the notion that those two statutes were but expressive of the ancient established rules of courts, and therefore, by their own vigor and office, performed no real function. But whether the statutes be allowed efficacy because of the lawmaker's *ipse dixit*, or because of the maxim, *Cursus curiae est lex curiae*, is immaterial. Let the honor go where it will, since in either event the same goal is reached, for the result is the same.

Some other exceptions were taken to the referee's report, but a careful study of the record confirms us in the belief that he dealt very kindly with appellant on betterments, taxes and rents. It should not be held there was error in confirming it.

III. *Of the merits.*

There was testimony tending to show as follows:

Rachel Botts, a widow and pensioner of the Civil War, had been a slave, could neither read nor write and was about ninety years of age at her death, to-wit, April 7, 1907. On February 15, 1904, she made her last will whereby she devised to trustees of the Francis Street Baptist Church, to be used for its benefit, all her estate, whether real, personal or mixed, including her right to insurance in the Metropolitan Insurance Company and every right she had in every· species of property—this, "in fee simple and absolutely." She

directed that her just debts be paid out of her estate as soon as found convenient. Her funeral expenses, however, were to be paid by the Daughters of the Tabernacle—we assume, her lodge. She was without any known descendant, was a devoted member of said Baptist Church and entertained a somewhat settled testamentary disposition towards it. No question is made over the validity of this will nor over its probate, which happened in due course on her death. Three months before she died she executed a deed to defendant to a lot (the little all she had) which she long owned as her home in St. Joseph, reserving a life estate to herself. Barring that reservation, the deed was in ordinary warranty form and was spread of record seven days later. The consideration expressed was $300, and the deed recited it was paid her by defendant and that she acknowledged its receipt. In fact, however, nothing was paid at the time; but afterwards thirty dollars in monthly installments of ten dollars each were paid. On the date of this deed (and as part of the same transaction) a contract was entered into between her on the one side and the defendant Polk and his wife on the other—a contract that provokes comment for what it contains as well as for what it does not. Suffice it to say, here, that after a whereas or two, reciting the deed and the affection between the parties, it provided that the Polks agreed to pay all taxes and then the force of the rest of it was spent in providing at some length that Rachel should keep up repairs and not create any liens and that the Polks should be relieved of the obligation to pay for the property except in monthly installments of ten dollars each up to $300, all payments to cease at Rachel's death. This contract was not recorded, was not referred to in the deed and created no lien for the purchase money, but did give a right of action for the whole sum on default of an installment payment.

The deed was delivered on the date of its execution, but at that time Mr. Polk was not in St. Joseph and did not sign the contract. It seems a space was left for his signature above that of his wife and his signature was attached later, on a date dark; and in the absence of Rachel. We infer the contract was left with Mrs. Polk at the time the deed was delivered. The witnesses, the Pepperells, were also witnesses to the deed. The one is Mrs. Polk's sister and the other her brother-in-law. Mrs. Polk kept a boarding house, and Mr. Polk was a traveling man. The lot on which was situate the Polk boarding house was close by Rachel's premises—"the old state road" (filling now the office of an alley) separating them. We infer the Polks were in debt and in very moderate circumstances. Sometime before their execution, the deed and contract were drawn by Mrs. Polk's attorney on information given him by her, he at no time consulting Rachel about either. We lay no blame to him, for he was not asked to consult her. Indeed, it appears that this aged colored woman, who was parting with practically her whole estate, had no disinterested and independent adviser, lay or professional, at her time of need, nor was it suggested to her that she needed one. The insurance referred to in her will amounted to a meagre sum. The lodge benefits were also a very small sum and at her death she had about eighty-seven dollars in ready money which passed to her executor. As to values, the best we can make out of the testimony is that the property conveyed by the deed was worth about $1000. We think that a fair estimate. Rachel owned it clear of incumbrance. There were two indifferent houses on it and defendant's expert put the ground at about $500 and the buildings at as much more, but these had been refitted and improved by Polk at the time of the estimate. On the other side there was testimony tending to show that its market value was from $1500 to $1600 and its rental value

$1800 to $2000.  Rachel lived in part of one house and from the other part (and other house) was receiving a small rent, say, five or ten dollars per month, which eked out her eight dollars monthly pension .

As to contractual capacity and health, on the part of defendant there was testimony to the effect that barring a hurt from an accident which lamed her shoulder there was nothing the matter with her in body or mind at the date of the deed.  For example, Mrs. Polk says: "She had the best mind of any woman of her age that I ever saw in my life; she was an active woman; she had kept her mind clear; she was a woman that had worked; she was a manager about her work and a manager about anything.  She was above the average—a sensible woman of her class. I considered her above the average and she was so considered by everybody that knew her."  Another witness, Mrs. Polk's cousin's wife, says: "I considered her of unusual intellectuality; I always thought she was a right bright old woman; never noticed anything that would indicate unsoundness."  Another witness, the sister of Mrs. Polk, said: "I judged her to be of wonderful intellect. . . .  Well, I never had thought of anything but that she was a very intelligent and capable woman for a woman of her years."  Another sister of Mrs. Polk testified that she thought Rachel "had an exceptionally bright mind for a woman of her age; I considered her extremely well balanced for a woman of her age."

The notary read over the deed and contract to her and noticed nothing wrong with her.  This was at Mrs. Polk's house and in her presence and that of the witnesses to the documents.

*Contra,* there was testimony from which the chancellor could well conclude that Rachel had suffered a stroke of paralysis on one side, which turned out to be progressive and for some months before her death affected her greatly.  That she was afflicted with rheu-

matism. That even before the deed was executed she was in bed and out during the day; she had been used to heavy labor in washing, but had left it off except light washing from Mrs. Polk and some of her guests. During that time she also suffered with a "misery" in her head which, growing worse and worse, developed into an abcess of the brain and finally carried her off. There was medical testimony that this abcess arose from degeneration of the brain substance, as well as of the arteries, i. e., senile degeneration antedating the deed in evidence. There was also testimony from which the chancellor could well conclude that long before the deed was made, bowed by the weight of years and infirmities, she had reached a typical stage of second childhood in all that term implies. Thus, she would be confused and bewildered from no adequate cause; had lost her memory for current things and happenings; would put her shoes on wrong and complain of her feet hurting; would put on her skirts "inside-out;" would get lost on streets she was familiar with; would forget to raise her umbrella when she was out in the rain; could not go to church without attendance; needed attention like a child and was whimsical and childish to a marked degree, doing what she was advised to do; and, to use the language of one witness, "was just the same as a child." She was nervous, acting when there was a knock at the door or when spoken to "as if something was going to take hold of her." Her taxes amounted to about six dollars per annum, and yet she was afraid she would lose her property on that account, having in mind a tax claim Mrs. Polk had straightened out for her.

On the part of defendant there was some testimony from Mrs. Polk and her sister that Rachel wanted *Mrs. Polk* to have the property, because of that lady's affection for her, wanted her to buy it at $300 and that the plan lagged for a spell because the old colored woman wanted cash and the Polks had not the

ready money to buy. Finally, the monthly payment plan was fallen on. The allegation of the answer that Rachel "induced defendant against his will to enter into the contract" is wholly unsupported by the testimony.

The testimony shows on both sides that the relations between Mrs. Polk and Rachel for many years had been analogous to that of guardian and ward. They bore to each other a relation of uncommon trust and confidence, seeing each other often and frequently talking over the property matter.

Their conversations in that regard were scantily drawn out on the stand, but it appears from some of defendant's testimony that Rachel was anxious about what would happen to her at the end of her days, and wanted Mrs. Polk (who had been kind to her) to take care of her, and the fair inference is that the property arrangement had reference to that desire. Mrs. Polk makes herself say she "expected to." While denying knowing anything about the will devising the real estate to the church, Mrs. Polk admits knowing from Rachel that the church was to have her insurance money and admits knowing that Rachel wanted her bills paid and Mrs. Polk promised her during their talks that she would attend to that. She also admitted she had Rachel's absolute confidence; was consulted by her about everything and was trusted implicitly by her in her affairs. Indeed, under the proof she was her only general adviser and counselor and attended to what business she had. Before the deed was made, Mrs. Polk admits saying to her that she, Mrs. Polk, "had always been faithful to her and she knew I always would be." She did not advise Rachel not to sell her property, *contra,* she thought it was a "good deal" for her.

There was a very old and decrepit colored woman, named Lee, living in one of Rachel's houses, a ward of the county, to whom she was attached by those

tender ties not uncommon to the lowly. Mixed in with this property arrangement was the idea that Mrs. Lee should stay where she was as long as she lived. In point of fact she died about the time or shortly after Rachel. We quote some of Mrs. Polk's testimony on this point (Rachel speaking, at the start): " . . . and she told me, 'If I let you have it, I will remain in it; I am not capable of selling this land; and you will let me remain,' and she told me, 'If you tell me you will do anything, you will do it.'

"Q. Now, Mrs. Polk, when was there ever anything said about the consideration; how the $300 was to be paid? A. It was her own way—I never said anything about it; she asked me if we could pay her so much a month, but I said, 'I didn't know whether I could or not, I will have to talk with Mr. Polk about it.' I never had made any transactions of this kind; and then when Mr. Polk came in we talked it over; and she said, 'Would we give her ten dollars a month and pay all taxes and all insurance and everything of that kind and let her remain there as long as she lived, also grandma Lee—ten dollars a month until she got $300; she said that was satisfactory to her.' "

It is not clear that defendant Polk had much of anything to do with the negotiations with Rachel. If he ever talked to her their conversation does not appear, nor is there any testimony that Rachel expected to sell to Polk or wanted him to have the property except the inference to be drawn from the bare deed and the contract, both of which were prepared in advance out of her presence, as said, and there is no testimony that she knew aught concerning their terms until she was called on to execute them.

Mrs. Polk testifies she acted for her husband, but whether Rachel knew or apprehended that fact does not appear. There is no testimony that Polk ever advised her about her business affairs or had ever won her confidence by kindness as Mrs. Polk had done. And

the record creates the impression that the old black woman thought she was *dealing with Mrs. Polk alone and had sold the property to her.*

Witness, the following (we quote from one of defendant's witnesses who talked with Rachel after the sale): "She told me of selling the property for $300; she said it was for her home, and Mrs. Polk was to keep up the taxes as long as she lived, and she was to pay her ten dollars a month, because she didn't feel that she could pay all down, and she said, 'If I should die to-morrow, the property is Mrs. Polk's; I could not trust anybody; nobody but Mrs. Polk; she is one I know of that I can trust.'"

On such record we are of opinion the decree should be affirmed. It is put beyond cavil that Mrs. Polk had long assumed such fiduciary relation toward Rachel, a relation accentuated by her extreme old age, her physical infirmities, her childishness (and, it may be, by her training as a slave to look up to a mistress) that the burden was upon defendant, who holds title only through the instrumentality of his wife, to show that the contract was just and fair. That burden he did not well carry. That such burden attends such relation is a wise doctrine as old as equity itself. Without it a court of conscience would be powerless to prevent confidential relations from being abused. Equity does not beguile itself by Utopian dreams in that behalf. It travels on the theory that where there is domination and confidence there is danger of misuse of them. It is not necessary to cite authority to that proposition nor to the other that where the weak, the illiterate, the confiding, the credulous are opposed in a challenged contract to the strong, the educated, the reliant, the shrewd, equity broods over the transaction with anxiety and watches it with vigilant and jealous eye to see that no unconscionable advantage is taken intentionally, or results without intention. As non-age has its shield, so has dotage.

By the arrangement Mr. Polk got a property for thirty dollars which was well worth $1000. True he took a chance of paying $300, but it is idle to ignore the fact that under the proofs Rachel had obviously reached the end of her days, and even if she had lived for thirty months the consideration was so grossly inadequate as to shock the conscience.

There is another view of this case by no means foreign to the proof, namely, *that Rachel did not intend to sell the property to Mr. Polk at all.* She placed no disclosed trust in him. She had no disclosed affections for him, nor (putting aside the inference arising from the cold letter of the deed) did she desire he should have her property. To the contrary, Mrs. Polk was in her mind, and, if the proof is not to be ignored, after the event she thought she had sold to that lady. We do not say that Mrs. Polk's name was attached to the contract as a lure to procure its execution by her, but we do say that if that had been the intention that signature was admirably contrived to that end; for no legal reason can be given why Mrs. Polk's name appears in the contract at all. She is not represented as owning property, whereby the signature might stiffen the contract, the deed had not conveyed to her, and the natural office of her signature and her name would be to connect the contract with her prior negotiations with Rachel and her personal promises outstanding to her. Wherefore?

There is still another view of the contract that makes it an object of anxious solicitude. Outside of the mere bagatelle of taxes to accrue, which the Polks assumed to pay, the monthly payments would not appreciably enhance Rachel's income, when her duty to make repairs is considered. We stress the fact that she was better off, from any standpoint, before the transaction than after it. That view is not without weight where the welfare of Rachel is an object of inquiry even on defendant's theory.

Again, the back payments were not secured, as they should have been, if Rachel's interests had been either paramount or active in the minds of those who dictated the contract. Tendering to this old, ignorant woman a naked right of action for the consideration, the right to go into court, was both an inadequate and *extraordinary* remedy. Moreover, an adequate reason for the sale is entirely lacking. Rachel's puerile fear that she was in danger of losing her home (a fear that might have given way if Mrs. Polk had seriously undertaken the task of disabusing her mind of that childish notion) was no reason standing a test of common sense.

Furthermore, we cannot escape the haunting idea that the true object in making this contract, operating on Rachel's mind, was to provide for care and ministration by her friend Mrs. Polk at a time now at hand when she was incapable of caring for or ministering to herself. That idea, in a pathetic way, ran through the negotiations like a thread of gold; but, singularly enough, it is not contained in the contract. The Polks did not so agree by the writing. Neither is the fact that the old colored woman, Lee, was to have a roof over her head and a hearthstone during her few remaining days, contained in the contract. Neither is any obligation to pay her debts contained in the contract. Observe, Mrs. Polk had promised all those things. When such considerations were the heart's desire of Rachel, her motive in the arrangement, it stoutly argues her entire incapacity to look after her own welfare, when she did not notice their significant absence from the writing.

And this leads up to the further proposition that the chancellor could have well found, under this proof, that Rachel Botts was incapable of making a contract at arms' lengths with the Polks.

The decree canceled the deed and returned to the Polks the thirty dollars they had paid and the taxes,

together with a just allowance for all betterments after deducting rents actually received.

We find no fault with it.

The principal opinion by our special judge does not deal with questions lodged in the case and discussed in paragraphs I and II of this dissent. This dissent was written in division on assignment as a deciding one, but was not concurred in except by our lamented Brother VALLIANT. In Banc we were equally divided—Brother WOODSON not sitting. On re-argument, the divisional opinion with such inconsequent changes as fit it for its new use is refiled as a dissent.

*Brown* and *Walker, JJ.*, concur in these views.