JOSEPH A. LASTOFKA ET AL. V. HARRY J. LASTOFKA, Appellant.—99 S. W. (2d) 46.

Division One, November 12, 1936.

*William Hilkerbaumer* for appellant.

*Arthur U. Simmons* for respondents.

FERGUSON, C.—This is a suit in equity in the Circuit Court of St. Louis County to set aside a deed whereby Anna Lastofka, since deceased, conveyed certain real estate in the city of Maplewood to her son Harry. The chancellor found for plaintiffs and entered a decree setting the deed aside from which judgment defendants appealed.

Anna Lastofka and her husband acquired the real property involved about 1889. The title was vested as an estate by the entirety. The property known as 2801 Bartold Avenue in the city of Maplewood is about three acres fronting 200 feet on Bartold Avenue and extending about 600 feet to the west. Bartold Avenue is the only street touching the property. About 100 feet west from Bartold "there is a sharp descent" sloping to a "creek bottom" which runs through the tract from north to the south. The improvements consist of a "two story, seven room brick house and a barn." These improvements were on the property at the time the Lastofkas acquired it, about 1889, and the property became the home of the Lastofka family. Five children were born of the marriage; Katherine, Harry, Joseph, Helen, and Raymond. In 1903 Katherine, the oldest, married a man named Pyatt and left the home. The father died in 1904 and thereupon title to this property, the family home, passed to the widow Anna Lastofka. Mrs. Lastofka received a small amount of life insurance; the only amount mentioned being $500. This home at 2801 Bartold and the small amount of life insurance constituted all, and the only, property Mrs. Lastofka owned. She had no other resources or source of income. Harry, Joseph, Helen and Raymond continued to live there with their mother. It does not appear when Joseph and Helen married but Joseph does state that he never contributed anything to the support of his mother or family or the maintenance of the property after he became twenty-one years of age in 1910 and it seems a fair inference, from other dates stated, that by 1912 or 1914 both Joseph and Helen had married and left the family home. Helen married a man named Kyle, and as Helen Kyle is a party to this suit. Neither thereafter contributed anything to the support of the mother or the maintenance of the property. Harry never married and resided at the home with his mother and contributed to her support and the maintenance of the property until her death on March 27, 1932. Raymond continued to reside at the family home. He married in 1925 and he and his wife resided at the Bartold Avenue property until the death of Mrs. Lastofka. Raymond did not testify and there is no evidence as to whether he contributed anything to his mother's support, the maintenance of the property or paid anything in the way of rent after he brought his wife there to live.

There was a mortgage, in the principal sum of $1000, on the property when Mr. Lastofka died in 1904. Apparently Mrs. Lastofka kept the interest paid. Mrs. Pyatt's (Katherine Lastofka) husband died in 1910. The date is not given but it seems that in about 1911 or 1912 Mrs. Pyatt loaned her mother $500, out of life insurance she had received on the death of her husband, and Mrs. Lastofka gave her a note for that amount. Mrs. Lastofka then paid the mortgage indebtedness against her property. In 1912 Katherine Lastofka Pyatt married a man named Irwin and as Katherine Irwin is a party to this suit. In 1920 Anna Lastofka borrowed $1000 secured by a mortgage on the property. This loan was made through the Wenzlick Real Estate Company, which company seems to have been her advisor over a long period of years in matters pertaining to this property and business matters generally. Out of this loan she paid her note to Mrs. Irwin which then aggregated $700, principal and unpaid and accrued interest. The Wenzlick Real Estate Company was composed of a father and son. The office of the company was in the city of St. Louis. The home of the younger Wenzlick was in Maplewood and in the same general neighborhood of Mrs. Anna Lastofka's home. In 1920 Mrs. Lastofka had the elder Wenzlick write a will which she executed at the company's offices, the younger Wenzlick being one of the witnesses. By this will she bequeathed the sum of $2000 to her son Harry and devised and bequeathed all the residue of her estate of every kind to her five children: ''Katherine Irwin, Harry Lastofka, Joseph Lastofka, Helen Kyle and Raymond Lastofka, share and share alike.''

At various times and for varying periods Mrs. Lastofka rented the downstairs or first floor of the house to Mrs. Irwin, Joseph Lastofka and Mrs. Kyle and their families. At such times she, Harry and Raymond, and after Raymond's marriage, his family, together occupied the second floor. It does not appear for what length of time but for at least a short period, following their marriage in 1912, Mr. and Mrs. Irwin rented the first floor paying her mother $12 a month rental. Joseph and his family rented and occupied the first floor at two different periods of about one year each. During the first period in 1919 he paid his mother a rental of $12 a month and during the second period in 1924 a rental of $13 a month. The rental arrangement was made with his mother. Mrs. Kyle and her family moved into the first floor in July, 1926, and rented and occupied it until September, 1928, two years and one month. At Mrs. Kyle's request Mrs. Lastofka had a furnace installed to serve the first floor, it did not serve the second floor, and Mrs. Kyle agreed to pay her mother $25 a month rent. When she moved out in September, 1928, she was $300 in arrears on rent. She later paid $100 on this amount but never paid the balance of $200. During this period Mrs. Lastofka,

Harry and Raymond and his wife lived on the second floor. The three children, for the periods mentioned, aggregating perhaps five or six years, though not consecutive, were the only tenants occupying and renting any part of the house from Mrs. Lastofka from the death of her husband in 1904 until her death in 1932, a period of approximately twenty-eight years, and such rent as they paid was the only income she derived from the property itself.

The son Harry seems to have been for the most part steadily employed working for varying periods and in various lines of work at weekly wages. He provided for the support of his mother and himself and supplied her with the funds as needed to pay taxes, interest on the mortgage indebtedness and to maintain the property. He was able to accumulate some savings and in 1923 he provided his mother the money to pay and discharge the $1000 principal sum of the mortgage indebtedness. The matter seems to have been attended to by the Wenzlick's. As evidencing that he had so provided this money his mother executed a promissory note in the amount of $1000 payable to him "without interest" and this memoranda appears thereon;" "the said sum being advanced to help pay off a deed of trust upon my property." This served to put an end to the interest Mrs. Lastofka had been paying. Four years later in 1927 Mrs. Lastofka was harassed by a special sewer tax bill against the property in an amount of about $1100. She consulted with the Wenzlicks about the matter and when they finally advised her it would have to be paid Harry drew on his savings and in October, 1927, paid the full amount thereof, $1136.60, in evidence whereof she executed a promissory note to Harry in that amount "without interest;" this memoranda was made thereon: "The said sum being advanced to me to pay a sewer bill against my property." Nothing was ever paid on either of the notes. Three years thereafter, November 15, 1930, Mrs. Lastofka executed a deed, which it is sought by this suit to cancel and set aside, whereby, after reserving a life estate, she conveyed the real property at 2801 Bartold Avenue to her son Harry. As to this transaction we refer to the testimony of Mr. Delbert Wenzlick, the younger member of the Wenzlick firm. We have noted that he lived in Maplewood in the general neighborhood of Mrs. Lastofka's home. He said he had known Mrs. Lastofka for more than twenty years prior to this date; that she had from time to time during the years come to their office "downtown" (in the city of St. Louis) and "she was in the habit of coming downtown to talk to my father. I gradually got acquainted with her down there and she asked if she could not come over to my house instead of going downtown and I told her she could." Thereafter she frequently went to his home to consult him about the property and business matters but we shall refer to that more fully later. The deed is dated April 10, 1930, evidently the date

it was prepared. Wenzlick says; that Mrs. Lastofka came to his home "a few days before" that date; that she told him, she "wanted to deed her property to her son Harry," that "Harry had put his money into it and she wanted him to have it" and "asked me what she should do. I told her we would have to get up a deed" and "she asked me to make up the deed;" that he later prepared the deed (evidently at his office in St. Louis) ; that she was to come "down to the office" to execute and acknowledge the deed "but did not come;" that she later went "over to the house and asked my wife to have me come over but I forgot it;" that "finally she came over (to his home) and waited for me to come home in the evening and asked me when I was going to bring the deed and I think it was the following Saturday afternoon I went over there with the deed;" that, Mrs. Lastofka "was there and Harry and her daughter-in-law" (Raymond's wife) ; that "I told her I had come out with the deed," and "I explained to her that it was a deed from herself to Harry, that it covered the property we were in" and "I told her that by that deed she was transferring or deeding that property to Harry and she signed the paper;" that, "in taking her acknowledgment, I asked her whether she understood what she was signing and that it was a deed to this property to Harry and she said that she did;" and, "I asked her if she wanted me to record it and she said she did and I took it along with me and recorded it." The acknowledgment is dated November 15, 1930, and the deed was filed for record November 18, 1930. The deed was signed and acknowledged one year and approximately four months prior to the death of Mrs. Lastofka on March 27, 1932.

Though there is no substantial evidence tending to show that they were forbidden by anyone to do so or offering any explanation of why they did not do so Mrs. Irwin, Mrs. Kyle and Joseph Lastofka rarely visited their mother's home. The evidence does not show ill feeling, dislike or animosity on the part of either Harry or Raymond toward them nor on their part toward Harry or Raymond. Since 1920 Mrs. Irwin and her family has resided at 7914 Caroline Avenue in Maplewood. She locates this address as being about two and one-half blocks from her mother's home. She stated that; "I did not visit up there (her mother's home) often;" that the "last and only time" that she went to her mother's home "in recent years" was "in October, 1930" when her mother was ill; that, however, she saw her mother "often," "she would come frequently to my home, some weeks three or four times a week and then again I would not see her for a whole week at a time." After she terminated her tenancy at her mother's home in 1928, Mrs. Kyle and her family resided at St. John's Station in St. Louis County and from and after that time she did not visit her mother's home. It appears that after that time, that is from 1928 to her mother's death in 1932, she saw her mother

but four times; one time Mrs. Irwin visited at Mrs. Kyle's home and brought Mrs. Lastofka; the three other times Mrs. Kyle saw her mother were when both chanced to be visiting at the home of Mrs. Irwin. Mrs. Kyle also stated that she had not visited in her brother Joseph's home, though he resides in Maplewood, for two years.

Neither the several nor the total amounts which Harry through the years advanced his mother for taxes, interest and other purposes are shown. It does appear that she had no resources or source of income whatever except this property and the only income she ever received from that was such rental as was paid, and above noted, by her married children, who for varying periods rented the downstairs or first floor. It seems undisputed that over a long period of years, at least twenty years, Harry advanced money to his mother for the payment of taxes and the preservation and maintenance of the property and for the support of his mother and the home maintained there. The only specific references to the amount of tax bills are the special sewer tax bill mentioned, supra, and ''St. Louis County taxes for the year 1932, $102.76,'' which was given merely as illustrative of the taxes against the property. We assume this figure represented the State and county taxes only for that year and that city taxes were in addition thereto.

The two-story brick dwelling house was more than ''40 years old.'' The only improvement since 1904 mentioned, except ordinary repairs, the roof, etc., was the installation of a furnace to serve the first floor. Plaintiffs had evidence that the reasonable market value of the land in April, 1930, was $5000 and the house $3000, total as of that date $8000.

Mrs. Irwin, Mrs. Kyle and Joseph Lastofka testified that they did not learn of the execution of the deed to Harry until after their mother's death whereupon this suit was filed. Mrs. Irwin, Mrs. Kyle and Joseph Lastofka are plaintiffs. Raymond refused to join as a party plaintiff and was made a party defendant with Harry. The petition or bill alleges want of consideration, mental incapacity of Mrs. Lastofka to execute a valid deed and that Harry ''did willfully, knowingly and fraudulently persuade, induce and cause the said Anna Lastofka to execute said deed.'' The allegation relating to mental incapacity charges that ''by reason of her physical inability and mental imbecility'' Mrs. Lastofka, at the date thereof, was ''utterly incompetent'' to make a valid conveyance and deed.

Drawing from the testimony of the parties to the suit and witnesses called by both plaintiffs and defendants we find a virtual agreement as to the following personal characteristics of Mrs. Lastofka. She was of ''German descent;'' ''had a grammar education . . . could speak English and get along very well with the English language;'' she ''was accustomed to work and a good housekeeper;'' ''she

was not very talkative," "talked very little," would rarely converse with anyone outside her own family or household, ofttimes when others would undertake to enter into conversation with her she would "ignore them;" except in a few instances, she did not become acquainted with, visit or converse with her neighbors; in the last years of her life she became "absent minded;" and "she never was much of a dresser." The record does not disclose Mrs. Lastofka's age at the time of her death.

We shall now set out the evidence adduced by plaintiffs purporting to establish mental incapacity or as alleged in the petition "mental imbecility." Mrs. Irwin testified, that "from 1925 up to the time of her death" her mother "was very poorly;" that "she was not very particular about her dress;" that at times when her mother would come to visit her the mother "was filthy" and "I would try to get her to explain why she came down (to Mrs. Irwin's home) like that" but "she would not make any statement . . . just stand looking at me in wonderment." She mentioned an incident which occurred at the funeral of Mrs. Irwin's uncle, in February, 1930, which was held at a funeral parlor; that her mother went to the toilet and got lost and her clothing became disarranged and Mrs. Irwin had "to arrange her things for her." Mrs. Irwin further stated: "I never talked to her about her property affairs. She never mentioned them to me and I never asked her about them . . . she knew what she had in the way of property." Mrs. Alice Palmberger resided on Caroline Street in Maplewood for about twelve years prior to 1931. She stated, that her home was about three and one-half blocks from Mrs. Lastofka's home; that she knew Mrs. Lastofka; that during the time she lived on Caroline Street Mrs. Lastofka "came down to see me . . . about once a month;" that she never visited in Mrs. Lastofka's home; that Mrs. Lastofka "was alright but about three or four years before she died she was pretty absent minded and she wasn't right." The basis for the witness's conclusion that "she wasn't right" seems to be: "she would not know me sometimes when I talked to her . . . and she was always dirty dressed," but this witness stated later, "she never was much of a dresser." As appears in the record before us this testimony is somewhat vague and confusing. On cross-examination the witness says she saw Mrs. Lastofka only two times after she (the witness) moved from Caroline Street and seems to say that the only time Mrs. Lastofka did not know her was an occasion when Mrs. Lastofka passed her on the street without recognition, "passed me up," but Mrs. Palmberger spoke to her and asked her "if she didn't know me" and they then had a conversation. Joseph Lastofka testified that when his youngest baby was born his mother was present "at the christening;" that some three or four months thereafter he and his wife went to his mother's home "one

evening and had the young baby'' with them and ''my mother was sitting there and she asked who that baby belonged to and I told her it belonged to me.'' The witness was unable to definitely fix the date of the christening or of this visit ''one evening'' to his mother but says both incidents were in 1929. It appears that Mrs. Lastofka had several grandchildren and great grandchildren and she seems to have attended christenings frequently not only within her own family but that of their in-laws. It seems, in fact that in the later years of her life her principal trips away from home, except visits to Mrs. Irwin, were funerals and christenings. She had not been in Joseph's home since the christening nor had he or his wife been to visit her and she had not seen them nor the new baby since. It is conceded that in her later years she was ''absent minded.'' We cannot attach the great significance to this incident plaintiffs would accord it. Mrs. Carry Lastofka, wife of Joseph, stated ''we never went down there (Mrs. Lastofka's home) very often;'' that in 1929 her mother died and Mrs. Lastofka attended the funeral; that Mrs. Lastofka ''was dressed in some bad clothes,'' that ''she didn't have much to say, she kind of stood away from us . . . she would be more to herself . . . stayed by herself;'' that sometime after the funeral the witness and her daughter went to visit Mrs. Lastofka at her home and Mrs. Lastofka ''asked Ruth (Raymond's wife who then lived in the home with Mrs. Lastofka) who the ladies were.'' This is all and the only reference in the evidence about this last incident. The surrounding circumstances are not revealed and it does not appear whether the light in the room was dim, whether Ruth met the callers at the door and Mrs. Lastofka from within the house, but out of view of the callers, made the inquiry or whether the incident occurred under such circumstances that Mrs. Lastofka might reasonably be supposed to promptly recognize her daughter-in-law and granddaughter. A Mr. and Mrs. Eichorn testified that they were frequent visitors after 1928 at the home of Mrs. Irwin; that on several occasions when they would be visiting in the Irwin home Mrs. Lastofka would come there; that ''she seemed quiet;'' and that several times she started to leave without her ''coat'' or ''wrap,'' ''would forget her coat,'' and Mrs. Irwin would have to remind her. Mrs. Eichorn said she ''never had a conversation with'' Mrs. Lastofka. Mr. Eichorn said: ''I would try to talk with her but she never would hold a conversation with me,'' which is in keeping with Mrs. Lastofka's natural disposition to reticence and timidity toward strangers.

As noted for more than ten years prior to her mother's death Mrs. Irwin lived at 7914 Caroline Avenue, which, Mrs. Irwin stated, is ''about 2½ blocks'' from 2801 Bartold, her mother's home. The location of these streets and distances are not clearly developed in the evidence but at 2801 Bartold that street is a north and south street

and, as the writer understands, Caroline Street is an east and west street south, distance not stated, of 2801 Bartold and Bartold intersects Caroline. Plaintiffs called as witnesses three women who lived on Caroline Avenue, neighbors and friends of Mrs. Irwin, and one woman who lived on Bartold, who testified to having at various times observed Mrs. Lastofka going to and returning from Mrs. Irwin's home. Their testimony briefly stated follows. The testimony of Mrs. Zirkle, 7902 Caroline, is somewhat confusing as to the number and time of incidents related. She told of Mrs. Lastofka coming to "her back porch" and asking for or calling "Kati" (Mrs. Irwin); that it was evident she was trying to locate Mrs. Irwin's house; that she attempted to assist Mrs. Lastofka but she replied "No, I know where she lives" and went "down the street." We repeat it is not clear whether this was one incident or whether several like incidents occurred for immediately after relating the matter Mrs. Zirkle upon being asked about the time said "that happened the year that she died" (1932) but her testimony continues by saying: "she would come there three or four times, walk in the middle of the street and come to my house on the porch and walk away and not say anything to me . . . that would happen about three times in one week at one time and then maybe two or three times a year probably . . . she did that for two years before she died. . . . I never had a conversation with her . . . would just tell her she was in the wrong place." Mrs. Deitz stated, that she lived on Caroline Street "the second door east from Kati" (Mrs. Irwin); that she had seen Mrs. Lastofka "go both ways to and from Mrs. Irwin's, always in the street. I have never had any conversation with her except casual remarks;" and that "she came to my house and asked me where Kati lived." We have quoted the last statement *verbatim* but another part of the examination of this witness indicates that it was intended to show by her that such incident occurred more than once. The question is asked, "How long would you say that continued? A. Over about four years. Q. That would be about 1928? A. Yes, sir." Mrs. Skinner, 5915 Caroline testified: "I live right across the street from Mrs. Irwin . . . I knew Mrs. Lastofka for 25 years . . . and during all that time I never had a conversation with her. She never stopped to talk only the time of day that was all. Nothing more than that. She was no different 25 years ago. She was more bewildered in her last stage of life. She would come to see her daughter . . . and when we were on the outside we would direct her to her daughter's home . . . This was from 1929 until she passed away." Mrs. Eva Peterson lived at 2862 Bartold "near the corner of Caroline." She testified: When Mrs. Lastofka went to her daughter's she had to pass my house before she got to Caroline . . . she would walk on the sidewalk until she got to Caroline . . . when she came to

Caroline she would walk in the middle of the street . . . The only thing I ever observed was that she just could not find her way to her daughter's home and I have taken her down there a number of times. . . . I just watched her and saw she could not find the place and would step out and ask her if she wanted to go to her daughter and she said 'yes.' These things all occurred two years before she died.'' (Evidently meaning during the two years preceding the death of Mrs. Lastofka.) A Mrs. Flueck testified that for sixteen years she and her husband, who died in 1932, conducted a grocery store at Bartold and Girard, ''that is south of Caroline;'' that several times during a period of about four years next preceding her death Mrs. Lastofka came into the store and made small purchases and would not have the money with her to pay for same; that witness or her husband would make a memoranda of the amount and the next time Mrs. Lastofka came in with money they would ''take out'' the amount of the former purchase and Mrs. Lastofka would say she did not remember that she had made the former purchase. A Dr. Reynolds in reply to a hypothetical question embodying as facts, that Mrs. Lastofka ''did not recognize her son's baby,'' ''was forgetful,'' ''got lost going to her daughter's home'' and ''would not know people that she had known for ten or fifteen years,'' gave it as his opinion that Mrs. Lastofka was of ''unsound mind and incapable of handling her own affairs.''

We look now to the evidence on the part of the defendant. We have noted that over a long period of years Mrs. Lastofka sought the aid and advice of the Wenzlick Company in reference to her property and business affairs relating thereto and that they exclusively handled all such matters for her and we have set out the undisputed testimony of the younger Wenzlick relating to the events and circumstances leading up to and surrounding the execution of the deed to Harry. It will be recalled that Mrs. Lastofka would call on the Wenzlick firm at their office in downtown St. Louis. It seems that for sometime she consulted the elder Wenzlick and that he personally advised her and attended to her business matters but the younger Wenzlick (who lived in Maplewood) says: ''When she was in the habit of coming downtown she talked to my father and I gradually got acquainted with her down there and she asked if she could not come over to my house instead of going downtown and I told her she could.'' Thereafter Mrs. Lastofka called upon the younger Wenzlick at his home. The testimony of the younger Wenzlick (Delbert Wenzlick) relates to the time prior to and of the execution of the deed. We will not here repeat his testimony concerning the preparation and execution of the deed. It will be recalled that the Wenzlick Company attended to matters connected with the loans she made, they looked after her insurance and ''gave her advice from time to time.'' Delbert Wenzlick testified: ''She came to my house quite frequently

and talked about her business affairs with me. She talked about her real estate. . . . When she talked to me about her property she talked in a way I understood what she wanted and she seemed to understand what her property was. . . . She would come over to the house very frequently along about the time I would come home, simply because I had known her for a long time and had always been patient with her and she would tell me a good many of her troubles. She evidently didn't talk a lot and did not make very many acquaintances. She talked to me about her real estate and her chickens. I don't think her mind had changed in the twenty years before the signing of this deed.'' These questions were then asked and answers given: ''Q. In your opinion Mr. Wenzlick was this lady at the time she made this deed of sound mind and capable of transacting her own business? A. Yes, sir; absolutely. Q. Do you think she had sufficient mind to know what she owned in the way of property? A. Yes, sir. Q. Do you think she had sufficient mind to know who her children were? A. I think so. Q. In your opinion, Mr. Wenzlick, did she have sufficient mind at the time she made this deed to know that she was transferring her property? A. Yes, sir, she she had.'' On cross-examination when asked if he did not know that Harry ''advised'' her and ''handled a great deal of his mother's business,'' the witness stated, that ''Harry may have handled business'' for his mother ''but she handled most of it herself;'' that several times ''she came to see me about a sewer tax bill. At one time we thought there was some way of getting out of paying the bill, later it was decided there was only one thing to do and that was pay it.'' In this connection the witness testified, that while his firm was investigating the sewer tax bill for Mrs. Lastofka Harry ''made some investigation in Clayton regarding it and reported to me . . . he came down and gave me the information,'' and that was the only time Harry ever advised with them about his ''mother's affairs.'' A reading of this witness's testimony is most convincing that Mrs. Lastofka herself attended to the business connected with the management of this property and such business affairs as she had. On cross-examination of this witness inquiry was made as to the dress, personal appearance and cleanliness of Mrs. Lastofka at the times she came to his home. He stated: ''She was clean . . . plainly dressed, I might say shabbily but I don't say untidy.'' A Dr. Brossard, a physician, testified that he first went to Mrs. Lastofka's home to treat Raymond's wife; that in the eight years preceding Mrs. Lastofka's death he ''waited on Raymond's wife on three occasions'' and Mrs. Lastofka ''at four different times;'' and that he did not observe anything ''in her conversation or conduct or in anything he heard or saw to indicate that she was a person of unsound mind.'' Walter Knotter, manager of a paint and hardware store stated he had known Mrs. Lastofka since as a child he lived near her home and

went there frequently to visit Harry. He testified: "Coming down to the last five or six years of her life I saw her on several occasions . . . she would stop in the store once in awhile" and talk with me "like a lot of old acquaintances of mine do . . . sometimes she would make a purchase of small articles . . . the last time I saw her at the store was about three months before her death . . . she stopped in to get a small can of paint," in the conversation with her on that occasion "we spoke of the weather," about her health and about Harry. Her conversations with the witness were normal and rational and he observed nothing in her conversation or conduct indicating any mental deterioration. Mrs. Rose Lastofka stated that her husband, who was then deceased, was a brother of Mrs. Anna Lastofka's husband and that she had known Mrs. Anna Lastofka for more than forty-nine years. Referring "to the last four or five years of her life" she said, that she and Mrs. Anna Lastofka would exchange visits "once or twice a year;" that the conversation between them at such times "was just family talk" in which Mrs. Anna Lastofka "would mention her children;" that Mrs. Anna Lastofka said "that Harry contributed almost everything that he earned to her and that he made almost all the payments on the property," "she told me that many times;" that she visited Mrs. Lastofka in her home at Christmas time in 1931, prior to her death in March, 1932, and "she seemed to be rational . . . she showed me what her son Harry had given her for Christmas . . . a beautiful silk dress, and six pairs of stockings . . . she always said that Harry provided everything for her . . . she was very quiet and never talked much." The witness stated that she had never seen anything in Mrs. Lastofka's conduct which indicated to her that she was not of sound mind. R. M. Thompson, father of Raymond's wife testified that after Raymond and his daughter were married that he saw Mrs. Lastofka "frequently;" that he visited at their home and Mrs. Lastofka visited at his home, usually coming with Raymond and his wife; that it was "difficult to get into a conversation with her;" that in 1929 she went with Raymond and his wife, the witness and two of his children, on a trip of "three days" to Illinois where they visited with witness's relatives; that on this trip "she talked freely about common things, about the people that she met and the country and the farms and things like that" and "was very normal, intelligent and pleasant." The witness stated that he saw Mrs. Lastofka after that and in his opinion she was "a woman of sound mind and capable of transacting her own business." The testimony of E. W. Spreen was that he had lived on Bartold Avenue "about 21 years . . . and about 200 feet," from the home of Mrs. Lastofka; that he saw her and conversed with her "quite frequently during the summer months;" that she would pass "through the yard and talk about the weather and what I was doing in my garden and about the

flowers that I raised and occasionally she talked somewhat about her family;" that she visited his wife and daughter occasionally "until they both passed away;" that in his opinion she was a woman of sound mind and capable of managing her own affairs during the time he knew her and "down to her death." The testimony of Mrs. Ruth Lastofka, who was married to Raymond in March, 1925, and they thereafter lived in the Bartold Avenue property with Raymond's mother, was that Mrs. Lastofka's conduct about the home was normal and natural and that she never observed anything indicating that Mrs. Lastofka was other than of sound mind. She testified that "up to the time of her death" Mrs. Lastofka assisted in the ordinary household duties, "would help wash the dishes, straighten out the kitchen, put the dishes away, prepare the meals, set the table and cook like anyone else;" the witness's second child was born in December, 1929, and "my mother-in-law took care of me . . . washed the baby . . . and did all the cooking at that time . . . she did the same thing when the first baby was born."

Under the practice in this State equity cases are "practically triable *de novo*" in the appellate court (Blount v. Spratt, 113 Mo. 48, 20 S. W. 967; Cohron v. Polk, 252 Mo. 261, 158 S. W. 603), and while we are constrained to accord due deference to conclusions of fact reached by the trial chancellor upon conflicting oral testimony involving the credibility of witnesses appearing before him nevertheless the appellate court is not bound by the trial court's finding of facts or its conclusions of law thereon "but has ever exercised a supervisory control over both" with the unquestionable right in such cases to review and weigh anew the evidence and give effect to the applicable rules of law. If upon such review it appears that the findings and judgment of the trial court "were not sustained by the evidence and law" the appellate court "would proceed to make its own finding and enter judgment as equity and justice might require." [Givens v. Ott, 222 Mo. 395, 410, 121 S. W. 23, 26.] "Otherwise appeals in chancery causes would be idle formalities." [Gottfried v. Bray, 208 Mo. 652, 663, 106 S. W. 639, 643; Cohron v. Polk, supra.] We have therefore set out at length and rather fully the evidence in this case. We shall consider and weigh the evidence taking the testimony of plaintiffs' witnesses bearing upon the issue of mental capacity, which plaintiffs make, as we find it.

Plaintiffs allege that at the time Mrs. Lastofka executed the deed to Harry she was "by reason of . . . mental imbecility utterly incompetent" to make a valid conveyance and seek cancellation thereof on that ground. The burden of proving the alleged unsoundness of mind and mental incapacity of the grantor at the time of the execution of a voluntary deed rests upon plaintiffs who seek to have it set aside. In this connection we make the observation that the cancellation of a deed "is an exertion of the most extraordinary

power of a court of equity, which ought not to be exercised except in a clear case." [Cohron v. Polk, supra.] In determining whether the evidence clearly shows mental incapacity at the time of the execution of the deed we shall first ascertain the correct legal test and then endeavor to apply it to the facts in evidence. The deed was not made in a transaction of bargain and sale of real property or a sale by the grantor for a valuable consideration or in an "exchange of values, within the ordinary meaning of conveyances of real estate" (Jones v. Thomas, 218 Mo. 508, 117 S. W. 1177) but was in the nature of a gift, or testamentary disposition, of the land by grantor to Harry motivated by gratitude, appreciation, love and affection and a desire to secure and reimburse him for the money expended by him in the preservation and maintenance of the property and in her support over a period of at least twenty years. Mrs. Lastofka had declared that all of Harry's earnings had gone into the property and for the support of the home and that he "provided everything for her." The other children did not contribute either to her support or the preservation and maintenance of the property. In 1920 when she executed a will she seems to have recognized and expressed a then existing obligation to Harry, or at least considered him entitled to a preference over her other children, in the amount of $2000 as she first bequeathed the sum of $2000 to him and the residue of her estate to Harry and the other four children "share and share alike." After that date in 1923 Harry paid the mortgage indebtedness of $1000 and took his mother's note in that amount "without interest" thereby stopping the running of interest and in 1927 he paid the special sewer tax bill of $1136.60 and took a note from his mother in that amount "without interest." When it is further considered that from 1904 until her death Mrs. Lastofka had no source of income whatever except such rental as she received at intervals from the first floor rooms and that Harry contributed the sums required to pay interest, taxes, upkeep and repair, and to preserve and maintain a home and provide for her support it is evident that moved by gratitude and appreciation she was expressing her preference, wish and desire as to the disposition of her property when she called on Wenzlick, her advisor, at his home and told him, that "she wanted to deed her property to her son Harry . . . that Harry had put his money into it and she wanted him to have it" and "asked" him "to make up the deed." "Under ordinary conditions of barter and sale it requires a higher degree of mental strength to make a valid deed than to make a valid will. But where a deed is executed by a parent conveying land to a child in consideration of love and affection," gratitude and appreciation, such as exist in this case, "that distinction is not made. In all cases where the mental capacity to execute deeds of the latter kind is called in question, the courts determine the question by applying the same test as they apply in cases

involving wills.'' [McFarland v. Brown (Mo.), 193 S. W. 800; Jones v. Thomas, 218 Mo. 508, 117 S. W. 1117, and cases there cited.] The ultimate legal test in cases of this kind and character is succinctly stated in Vining v. Ramage, 319 Mo. 65, 3 S. W. (2d) 712, 721, in this way: ''Did the grantor have sufficient mental capacity, at the time of the transaction, to understand the nature of the particular transaction, and did she, with such understanding, voluntarily enter into and consummate the same?'' The same legal test is laid down by this court in Masterson v. Sheahan (en banc), 186 S. W. 524, 526.

 We endeavor to apply the foregoing test to the facts in evidence. Plaintiffs rely upon the incidents sometime in 1929, upon which we have commented, when it is claimed Mrs. Lastofka did not recognize, and remember the birth of, a grandchild and later asked ''who are the ladies'' when a daughter-in-law and granddaughter called at her home, the tendency on the part of Mrs. Lastofka on occasion to become confused and apparently unable to find Mrs. Irwin's home, the testimony of the storekeeper that she would forget making small purchases, and the testimony as to absent mindedness, as showing she was of unsound mind and mentally incompetent on November 15, 1930, to make a valid deed. The testimony of the women, Mrs. Irwin's neighbors, as to a tendency on the part of Mrs. Lastofka, at times, to become confused or lost after she reached Caroline Street on her way to Mrs. Irwin's home was indefinite as to time and frequency, they merely placed the incidents as having occurred during the year in which she died, or during the last two or three years of her life, and too it is difficult to determine whether each refers to one such incident or a series of such incidents and if so with what frequency they occurred, nor does it appear whether these three or four witnesses were describing the same or different incidents. Certainly this confusion was not continuous or general for Mrs. Irwin said her mother always visited her at least once a week and ''some weeks'' would come to her home ''three or four times a week.'' The most this testimony shows is that at times during the last years of her life Mrs. Lastofka upon reaching Caroline Street would become confused as to the location of Mrs. Irwin's home. When this tendency first commenced does not definitely appear. None of these ladies had ever conversed with Mrs. Lastofka, apparently knew nothing of her everyday habits of life or her conversation or conduct and none of them undertook to give an opinion as to whether she was of sound or unsound mind. Aside from plaintiffs themselves and one daughter-in-law none of plaintiffs' witnesses ever conversed with Mrs. Lastofka, to any extent, or knew anything about her ordinary, daily course of conduct or had any business relationship of any kind with her or were ever present at the transaction of any business by her, except the small transactions, at an indefinite time, with the lady storekeeper which at most were indications of absent mindedness. We have

commented upon the few incidents plaintiffs and. the daughter-in-law, Joseph's wife, mentioned. Plaintiffs in their own testimony do not undertake to deny, but rather seem to at least tacitly admit, that their mother knew and comprehended what and how much property she owned and who her children were. It does not appear that the tendency at times to become confused as to the location of Mrs. Irwin's home, or that at times she was absent minded or other eccentricities or peculiarities shown by plaintiffs' evidence in any way related to or affected Mrs. Lastofka's comprehension of her property or her relationship to her children or dominated or influenced her judgment in relation thereto or prevented her from understanding the nature and effect of her act in executing the deed. Plaintiffs offered no evidence bearing directly upon the making of the deed and there is no direct evidence in the record tending to show that at the time of the execution of the deed Mrs. Lastofka was not fully aware of the property she owned, understood the nature of the transaction, and knew her children and their claims upon her bounty. The facts and circumstances shown by plaintiffs' evidence do not, in our opinion, sustain a finding that on November 15, 1930, the date of the execution of the deed, Mrs. Lastofka was of unsound mind and mentally incapable of making a valid deed. We would not be warranted in holding that mental incapacity, as of that date, is so clearly shown as to require the exercise of the extraordinary power of a court of equity in the cancellation of the deed. Defendant's witnesses were in much better position to observe and know Mrs. Lastofka's conduct, habits, conversation and manner of life and while they recognized certain rather fixed characteristics and peculiarities with one accord they gave an opinion that she was, to the time of her death, of sound mind. Wenzlick's testimony is not questioned. He had no personal interest to serve and his long acquaintance with Mrs. Lastofka lends weight to his opinion. His testimony convincingly shows that she had mental capacity to understand the nature and effect of her act and with such understanding voluntarily executed the deed.

As to the charge of undue influence on the part of Harry. Plaintiffs take the position that the evidence shows a fiduciary or confidential relationship existed between the mother and son, the grantor and grantee in the deed, and that such fiduciary or confidential relationship having been shown a presumption of undue influence thereupon arose and plaintiffs say the "burden was then shifted to defendant to disprove undue influence" and that he "failed to sustain this burden." In Loehr v. Starks, 332 Mo. 131, 56 S. W. (2d) 772, this court en banc, citing cases, said: "We have held that the mere opportunity of a beneficiary to exert undue influence unsupported by other evidence showing its actual existence does not raise a presumption of undue influence" and "it is not the rule in

this State that a mere confidential relation raises a presumption of undue influence. The weight of authority is against that rule. . . . Cases containing statements indicating that a mere confidential relation raises a presumption of undue influence are to that extent overruled." It has often been said the "undue influence need not be shown by direct proof but may be inferred from facts and circumstances." [Dimity v. Dimity (Mo.), 62 S. W. (2d) 859.] Under the Loehr case, supra, undue influence will. not be inferred or assumed from the mere showing that a fiduciary or confidential relationship existed between the grantor and the grantee but the burden is upon plaintiffs to adduce facts and circumstances from which it may be inferred undue influence was exercised by the grantee.

In the instant case it can hardly be said that there was an "especial trust in the management by the son of the mother's business affairs." [McFarland v. Brown, supra.] The mother seems on the contrary to have personally attended very largely and generally to such matters as arose in connection with the management of the property. It is true that Harry contributed to her support and provided large sums of money, as needed, over a long period of years for the support of the home and the maintenance of the property but in the matter of loans made against the property, insurance thereon, even tax questions, matters generally relating to and affecting her property and any other matters of a business nature, the making of a will and the execution of the deed involved, she sought the advice and counsel and employed the services of the Wenzlicks over a period of more than twenty years. When Harry advanced her the money to discharge the mortgage indebtedness against the property and the sewer tax bill taking her personal and unsecured notes "without interest" the transactions were handled by the Wenzlicks. Wenzlick testified that in more than twenty years he had known of but one instance in which Harry had personally acted for his mother in matters connected with her property and that was while his firm was engaged in investigating the sewer tax bill for Mrs. Lastofka Harry made some inquiry about some phase of the matter at Clayton and reported to him. The children who occupied the first floor of the home as tenants made the rental arrangements with the mother and paid the rent to her. Harry testified that he turned his wages over to his mother and she would pay the household expenses and return to him such sums as she was able to save from week to week which for the most part he deposited in a bank. He had no general charge of her business and she committed no special authority to him in reference thereto.

Certainly no inference of undue influence can arise from the relation of mother and son and the performance by him of the moral duties of affection and kinship, or from the circumstances that he never married, lived in the home with his mother, provided for her

support and care and secured to her the enjoyment and protection of the home. But it is argued that by reason of these facts and the close personal relation between them Harry possessed and exercised an unusual influence over his mother. The question however is, does the evidence tend to show that he procured the execution of this deed through undue influence? A voluntary act influenced by the love, affection and gratitude of a mother for a dutiful son cannot be said to be the result of an undue influence. Undue influence cannot be made out by mere suspicion or the mere showing of an opportunity to influence. "There must be somewhere proof of an undue influence itself. . . . To be effective, it ought to be sufficient to destroy the free agency of the deceased at the time of making the" deed. "It must not be merely the influence of natural affection; for affection is a stream that presumably flows at all times and its waters are under no ban known to the law. There must be present and in active exercise overpersuasion, coercion or force, fraud or deception breaking the will power of the" grantor. [Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46.] The charge of undue influence on the part of Harry seems to rest largely upon suspicion and the theory that the situation was such as afforded opportunity to influence his mother to make the conveyance to him. There is no express evidence, nor any from which it may fairly be implied, that Harry ever besought, requested or suggested that his mother convey this property to him or that he ever attempted directly or indirectly to influence the grantor in the disposition of her property. So far as the evidence shows he had no part in arranging for the preparation or execution of the deed. His mother went alone to Wenzlick whom she trusted and told him what she desired to do and presumably Wenzlick advised and discussed with her the form of the conveyance and doubtless suggested the reservation of a life estate. The deed was placed of record within two or three days after its execution. Mrs. Lastofka never afterwards, so far as appears, complained of it to Wenzlick or anyone else, nor wanted it recalled. There is no showing of any ill will on the part of Harry toward his brothers and sisters. Mrs. Lastofka was under no restraint, she came and went alone, visiting Mrs. Irwin at least weekly and ofttimes two or three times a week. The other brothers and sisters could have come any time they desired, so far as anything in this evidence indicates, to the mother's home. No least intimation appears that Harry ever in anyway attempted to prejudice or influence his mother against his brothers and sisters or that she was prejudiced against them. There is not a syllable of evidence that Harry ever tried to acquire any interest in his mother's property during her lifetime. He did not even require a mortgage to secure the money paid in 1923 to discharge the mortgage then against the property and in 1927 to pay the sewer tax bill but instead took her notes "without interest" and reading "payable after my

death,'' indicating that he contemplated awaiting payment out of her estate upon her death and that without interest. Nor under the circumstances can the disposition of the property be said to be unnatural. [McKissock v. Groom, 148 Mo. 459, 50 S. W. 115; Bennett v. Ward, 272 Mo. 671, 199 S. W. 945.]

We find no facts or circumstances from which undue influence can be clearly inferred and which afford that quality and degree of proof required for a court of equity to set aside a deed on that ground. This brings us to the fundamental proposition that the ''owner of property has unlimited power to alienate it by deed or will, if the act is understandingly done and is free from coercion, fraud or lack of mentality or undue influence. This right of arbitrary disposition of a capable and uninfluenced person is a corollary of absolute ownership of property, and may be, and often is, reflected in deeds or wills exhibiting the loves, hates, or partialities of the testator or grantor, which cannot be annulled for these reasons only.'' [Bennett v. Ward, supra.] The direct and positive evidence in this case shows a deliberate and clear intent on the part of the grantor, for reasons which she deemed adequate, to prefer a son to her other children in the disposition of her real estate. ''Such purpose, however, is not sufficient to defeat the deed'' in the absence of evidence that the reason for the preference ''was extraneous domination of the mind of the grantor to the extent that, when the conveyance was made, it reflected not her intentions or wishes, but the different designs and intentions of someone who controlled her action. For this is what is meant by undue influence, . . . as to the existence of which there is a complete dearth of positive testimony.'' [Bennett v. Ward, supra.]

Much as we may be inclined to defer to the finding of the trial chancellor in a case of this kind, after a close and careful examination of the record herein we are constrained to question the correctness of the finding and judgment below and hold that upon the whole record and under the applicable law plaintiffs failed to establish either mental incapacity or undue influence. The judgment of the trial court must therefore be reversed and the cause remanded with directions to dismiss the bill or petition. It is so ordered. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.