**T. W. VINEYARD, Guardian of the Person and Estate of Sarah Margaret Vineyard, Appellant,**

v.

**Steve VINEYARD et al., Respondents.**

**No. 51965.**

Supreme Court of Missouri, Division No. 1.

Dec. 30, 1966.

---

Ronald J. Fuller, Rolla, for appellant.

Claude T. Wood, Richland, for respondents.

HOLMAN, Presiding Judge.

On October 4, 1963, Sarah Margaret Vineyard (hereinafter called Margaret)

executed five warranty deeds by which she conveyed to certain of her relatives the five separate parcels of real estate owned by her. She reserved a life estate in each of those properties. Margaret was adjudged incompetent on October 22, 1964, and a brother, T. W. Vineyard, was appointed her guardian. The guardian thereafter filed this suit in which he sought to set aside three of the aforementioned deeds, alleging that Margaret executed the deeds as the result of undue influence exercised by defendants at a time when she did not have sufficient mental capacity to make said deeds. A trial resulted in a judgment for defendants and plaintiff duly appealed. Prior to the submission in this court Margaret died, and appropriate parties have been substituted as plaintiffs-appellants in place of the guardian. We will continue to refer to the guardian as plaintiff.

The five deeds executed by Margaret all conveyed property in or near Dixon, Missouri. In the three deeds here involved, "the home place" was conveyed to her niece, Myrtle Williams and husband Virgil, the "Raines house" to her nephew Charles Vineyard and his wife Grace, and the "flat-top house" to her brother Steve Vineyard and his wife Belle. At the same time, the "apartment house" was conveyed to her brother Jesse and his wife Edna, and the "acreage land" to her brother, plaintiff T. W. Vineyard. This suit did not seek to set aside the deeds to Jesse and T. W.

Margaret was born and reared on a farm located about ten miles northeast of Dixon. She never married. She was 75 years old at the time the deeds were made. She lived at home with her mother until 1924 when her mother was drowned in a ferryboat accident. Shortly after her mother's death Margaret went to St. Louis where for 22 years she worked as a cook in homes of wealthy people. In 1946 the wife of her brother George Vineyard died, and at George's request, she came back to Dixon to keep house for him. They lived on George's farm until 1956. At that time George sold the farm and built a new home

in Dixon and they moved there. George died on April 10, 1963, and left the bulk of his estate to Margaret, including the five pieces of property she conveyed on October 4, 1963. Her brother Jesse was the administrator w. w. a. of George's estate. In June 1963, Margaret fell and sustained severe injuries to a knee. She was taken to Phelps County Memorial Hospital at Rolla where she remained until July 17, and was then admitted to the McFarland Nursing Home in Rolla where she remained until October 5, 1963.

After she returned home Margaret's niece, Myrtle Williams, and her husband, lived with her for 70 days. Thereafter various relatives and others stayed with her from time to time, and sometime later she re-entered the nursing home where she was residing at the time of the trial.

In order to prove the facts surrounding the making of the deeds plaintiff called defendant Charlie Vineyard, Margaret's nephew, as his first witness. Charlie testified that Margaret had mentioned to him a number of times that she wanted to make deeds to her real estate; that at her request he went to the recorder's office in Waynesville and had the recorder copy the description of each of the five pieces of property on a paper, and he delivered this paper to Margaret; that when he went back later she had written on the paper the names of the persons to whom she wanted to deed each of the properties, and had also written directions for her will on another piece of paper; that she requested that he have someone prepare the deeds and will because she wanted to have that business taken care of before she left the nursing home as there was no one in Dixon who could prepare those instruments; that he went to Attorney E. E. Northern in Rolla and employed him to prepare the papers; that a few days later, October 4, he, Myrtle, and Virgil met Mr. Northern at Margaret's room in the nursing home; that after the papers were executed Margaret delivered the deeds to him and he took them to Waynesville that after-

noon and had them recorded because Mr. Northern had advised that they be recorded at once. He testified on cross-examination that Margaret's home in Dixon was just across the alley from his home; that his sister Myrtle lived nearby and they frequently helped Margaret with her household duties. He stated that none of them ever tried to persuade Margaret to make the deeds; that it was entirely her idea; that in his opinion she was mentally competent at the time the deeds were executed.

The papers mentioned in Charlie's testimony were admitted as exhibits at the trial. They show that Margaret wrote the name of the persons who were subsequently the grantees below each description that had been obtained from the recorder and signed her name thereunder. The directions for her will were written in her handwriting on another sheet of paper in the following language: "After all my funeral expense and bills are paid in full I want all of my cash to be divided equally among all my brothers—Steve, Jesse, Tom Vineyard. I also want Myrtle Williams to have all of my personal belongings and household furniture that is left in my home at the time of my death. I request that Charley Vineyard be the administrator. [signed] Margaret Vineyard."

Plaintiff presented the testimony of a number of witnesses relating to Margaret's mental capacity at or near the time the deeds were executed.

Dr. Earl Feind testified that he was one of the three doctors who attended the patients at the nursing home; that the record indicated that Margaret was senile and was forgetful and would become confused; that he saw her a number of times, including (according to the record) October 4, 1963, and when asked his opinion as to her mental capacity he said he doubted if she had the capacity to know her interest in property and to understand her act in executing a deed. However, on cross-examination he testified that Margaret was rational at times and that her mental condition would change and you "couldn't tell her state of mind from hour to hour."

Plaintiff also offered as a witness Barbara Clancy, a registered nurse, who was a supervisor at the nursing home. She testified that Margaret was always depressed and couldn't carry on conversations with her; that she whispered to her that things were being stolen from her room, although the witness thought nothing was missing; that she would take linens from the linen cart; that Margaret had a toilet in her room, but when she went down the hall to the bathroom to take a bath she would always take her purse and sometimes some paper bags; that she would pour her fresh water into the toilet and then complain that she hadn't received any drinking water; that on one occasion Margaret asked her if she had canned that bushel of peaches she had given her, but that the only peaches Margaret had received were three or four that someone brought to her in a sack; that she saw her on the early morning of October 4; that later someone advised her that they wanted her to witness some papers in Margaret's room but that she refused to do so; that she was of the opinion that Margaret was of unsound mind although she didn't know her exact condition at the time the deeds were signed.

Freda Campbell, a nurse's aid at the nursing home, testified that Margaret couldn't carry on a clear conversation; that she always kept her purse with her and had a bell in it which would jingle when someone moved it; that she protested when Margaret took linens off the cart but Margaret said she needed them. As will hereinafter appear, the court sustained an objection to the qualifications of this witness to express an opinion on Margaret's mental condition.

Another nurse's aid, Mrs. Jo Hudgens, gave testimony somewhat similar to Mrs. Campbell's and was likewise not permitted to express an opinion on Margaret's mental condition.

Plaintiff Tom Vineyard, a brother of Margaret, testified that Margaret had 32 nieces and nephews, 24 of whom, because of the death of a parent, were her heirs. He stated that he had lived most of his life in Iowa but usually came back to Dixon once a year to visit; that he commenced to notice a change in Margaret after 1950; that he came back and visited her often while she was in the hospital and nursing home in 1963; that he returned to Iowa early in October and did not know about the deeds until someone sent him a clipping from the paper; that Margaret's conversation "wandered"; that while in the nursing home she complained of seeing various individuals in her room who were not there and said that two negroes were trying to get into her dresser. He expressed the opinion that she was not of sound mind on October 4, 1963. He further stated that he moved back to Dixon on December 6, 1963, and that Margaret told him, in regard to the deeds, "I've done wrong and I want you to break it up." On cross-examination he testified that when he came back from Iowa he "wanted to get something started," and had himself appointed as guardian so he "could bring this suit."

Prior to the trial Margaret's brother Jesse died, but his widow Edna testified. She gave instances of Margaret's forgetfulness and confusion dating back to 1956. She stated that after George died Margaret kept a club by the window because she thought someone had tried to break in her home; that when she thought someone was trying to break in she would pop sacks so they would think she had a gun; that when Margaret was in the hospital she said she could see a cornfield out the window, and a tree that George had set out; that in her opinion Margaret was of unsound mind on October 4, 1963. Edna also testified that she and her husband went with Myrtle and Charlie and talked with Attorney Eldridge in Waynesville about Margaret making deeds and he said he wouldn't prepare the deeds; that later she heard Virgil Williams tell Jesse that Margaret

wanted "to do some business" and, "I'm going to help her and this is the way I've got it planned out. I'm going to give Myrtle the home place, I'm gonna' give Jesse the Baker place, and I'm gonna' give Tom the acreage range out there, and I'm going to give Paul the flat-top house."

On behalf of the defendants, Attorney Northern testified that he prepared the will and deeds from the directions Margaret had written on the papers which had been delivered to him; that on the morning of October 4 he met Charlie, Myrtle, and Virgil in Margaret's room; that after visiting with Margaret for a time he mentioned to her that she could give the real estate to her relatives by will instead of deeding it to them; that she told him she understood that but that she wanted to make the deeds because certain of her relatives had been especially good to her, particularly Charlie, Virgil and Myrtle, and she felt closer to them than anyone else; that he then read each description to her from the deeds and she affirmed that she wanted that particular property to go to the named grantee; that the deeds were then executed; that he then read the will to her and she stated that that was the way she wanted her will; that a witness was then called and the will was executed; that at Margaret's direction he then gave Myrtle her deed and the other deeds to Charlie and advised that the deeds be recorded at once; that in his opinion Margaret was of sound mind on the date the deeds were executed.

Mrs. Orletta Hogart testified by deposition that she was a registered nurse and was a part-time supervisor at the nursing home; that she gave Margaret medication and supervised her care; that she had conversations with Margaret almost every day that she worked (three days a week); that Margaret had a sense of humor, was proud of her family, and she enjoyed talking with her; that she was a cooperative patient and, in her opinion, Margaret's memory was good and "she knew what she was doing." This witness testified positively

that Mrs. Clancy was not on duty at the nursing home on October 4, 1963.

Myrtle Williams testified, but her testimony is largely cumulative and is not particularly significant. She did state that she had worked in the home of her Uncle George on a number of occasions and that it had been decided before he died that she was eventually to have one of the pieces of property; that Margaret, before she became ill, had asked her to say which one she wanted but she refused to do so and told Margaret to choose the one she wanted her to have; that she never at any time requested that Margaret make a deed to her.

Myrtle's husband, Virgil, did not testify because of his health. It appeared that he had suffered a heart attack a short time before the trial and was not able to be present.

Defendant Steve Vineyard testified that he saw his sister Margaret frequently and that her conversations were always normal; that he did not know anything about the deeds until after they had been recorded and that, in his opinion, Margaret was of sound mind in September and October 1963.

Margaret's minister, Edwin E. Baur, testified that he visited her in the hospital and also in the nursing home, and that he saw her the next day after she came back to Dixon; that she was very interesting to talk with, and from his conversations with her he would say she was of sound mind. He further testified that Margaret later said to him, "I done something that's going to cause some hard feelings in the family and I'm just ·as sorry as I can be. * * * I deeded my property away and I guess I didn't know what I was doing."

Defendants also presented the testimony of a number of lay witnesses who expressed the opinion that she was of sound mind at or near the time the deeds were executed. We will list these witnesses and state briefly their contacts with her. Clara Crider, widow of a Dixon physician, who had known Margaret since 1914 and talked with her in the spring before her injury and in the fall shortly after she returned to Dixon; Mary Matkin who spent a half day in Margaret's home in October 1963; Graham Matkin who conversed with Margaret for four hours on November 15, 1963; Della Click of Rolla, who had known Margaret since she was a little girl and visited her a number of times at the nursing home; Nellie Copeland of Rolla who had known Margaret all of her life, and often visited her while in the hospital and nursing home in 1963, the last time being two or three days before she went back to Dixon. This witness also testified that she had a nephew who had stayed in the nursing home for a long time and that people stole things from his room and that someone had stolen a box of fruit from Margaret's room. Virgil Copeland of Rolla, who talked with Margaret in the nursing home a number of times, the last time being two or three days before she left; Clarence M. Kennedy of Dixon, who visited with Margaret on October 5 and on October 15, 1963; Velma Green, a neighbor, who talked with Margaret on October 7, 1963, and every few days thereafter; Florence Vineyard, a sister-in-law of Margaret, who visited her often in the nursing home and the next day after she returned to Dixon; and Earl Groves who visited her at the hospital and nursing home and saw her a day or two after she returned to her home.

■ We will first consider the plaintiff's contentions of error relating to the admission and exclusion of opinion evidence by lay witnesses. He says that the court erred in admitting the opinions of lay witnesses offered by defendants to the effect that Margaret was of sound mind because those witnesses did not detail sufficient facts upon which to base those opinions, or to show that they had sufficient opportunity to observe her. In considering similar contentions this court has said that "before a lay witness will be permitted to give his opinion that a person is of unsound mind, he must first detail the facts

upon which he bases such opinion, but if he expresses an opinion that such person is of sound mind, he is not required to detail the facts upon which he founds his opinion. The reason for the rule is obvious. An opinion that a person is of unsound mind is based upon abnormal or unnatural acts and conduct of such person, while an opinion of soundness of mind is founded upon the absence of such acts and conduct." Kaechelen v. Barringer, Mo.Sup., 19 S.W.2d 1033, 1037. In this instance all of the defendants' lay witnesses had opportunities to observe and talk with Margaret at or near the time the deeds were executed. It is obvious that the court did not err in admitting their opinion testimony.

■ Plaintiff also contends that the court erred in ruling that the two nurse's aids were not qualified to express an opinion that Margaret was of unsound mind. In considering the ruling as to Mrs. Campbell we note that she gave a number of unresponsive answers to the effect that Margaret was not of sound mind. Upon motion those answers were stricken. We have concluded that for the purposes of our decision herein we will disregard the fact that those answers were stricken and will consider that Mrs. Campbell gave opinion testimony to the effect that Margaret was not of sound mind. In view of that decision we need not determine the correctness of the trial court's rulings in that regard. The contention that the court erred in precluding opinion testimony by Mrs. Hudgens is not before us for appellate review since plaintiff made no offer of proof as to what her testimony in that regard would have been. Thayer v. Sommer, Mo.Sup., 356 S.W.2d 72 [12].

■ In our consideration of the issues presented we should bear in mind that the cancellation of a deed "is the exercise 'of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case,' Lastofka et al. v. Lastofka, 339 Mo. 770, 99 S.W.2d 46, l. c.

54, and the evidence to justify cancellation should be clear, cogent, and convincing." Edinger v. Kratzer, Mo.Sup., 175 S.W.2d 807, 813. Plaintiff had the burden of proof to present evidence which, when tested by the applicable rules, was sufficient to require the cancellation of the deeds. "And where, as here, it is sought to set aside a voluntary deed because grantor lacked the mental capacity to execute a valid instrument of conveyance to his property, the burden is upon those who seek to have it set aside to establish that *at the time of its execution* grantor lacked such mental capacity. * * * The law differentiates between the mental capacity required of grantor making a deed as a part of the arms-length business transaction and the mental capacity required when grantor is receiving but the satisfaction of heart and mind which comes from benefitting those near and dear to him. In the latter instance if he has sufficient mental capacity to know the extent of his property, his relatives and their respective claims on his bounty, the demands of the law have been satisfied. * * * [and] mere proof of illnesses, or imperfect memory, or forgetfulness of names and persons, or old age with its attendant physical and intellectual weaknesses, or mental confusion, or arteriosclerosis, either singly or in combination, unless it further appears that grantor did not understand the nature of the instant transactions, and did not with such understanding voluntarily enter into and consummate the transactions, are insufficient to invalidate these deeds." McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 703, 704. Also, "[u]ndue influence, which is sufficient to warrant a court in holding a will or a deed invalid, must be such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another." Shaw v. Butler, Mo.Sup., 78 S.W.2d 420, 428. "Appeals in equity cases such as this are heard de novo on the record as made below, the reviewing court determining the weight and value of the evidence, but usually deferring to the findings of the chan-

cellor, especially where there is conflicting oral testimony involving credibility of witnesses, except when convinced that such findings are against the weight of the evidence." Been v. Jolly, Mo.Sup., 247 S.W. 2d 840, 853.

In deciding the case the trial court made detailed findings of fact and concluded that the evidence did not support the allegation of undue influence on the part of defendants, or the contention that the grantor was mentally incompetent at the time the deeds were executed, and hence that plaintiff had failed to sustain the burden of proof required for cancellation of the deeds.

After a careful review of all the evidence we have concluded that the weight of the evidence strongly supports the findings of the trial chancellor. We not only defer to his findings but have independently arrived at the same conclusions. We have stated in detail the evidence tending to support plaintiff's contentions as well as that of defendants tending to refute those charges. It would be useless repetition to restate that evidence in discussing our decision. We will, however, refer to some items of evidence which appear to us to be particularly persuasive.

The strongest evidence presented by plaintiff was the testimony of Dr. Feind and that of the registered nurse, Mrs. Clancy. However, the doctor's testimony is not convincing as to Margaret's mental condition at the time the deeds were executed because he said she was rational at times and her condition would change from hour to hour. Also, as to Mrs. Clancy, there is testimony indicating that she may have been mistaken about being on duty on October 4, 1963.

On both the issue as to Margaret's mental competency and that of undue influence, we think the following items (among others) strongly support the findings for defendants: (1) Mr. Northern, an experienced attorney, was with Margaret for some time on the morning the deeds were executed. He advised her concerning the situation and she told him the reason she wanted to make the deeds. It was his opinion that she was of sound mind at that time. (2) Margaret had previously (apparently while alone) written in her own handwriting (and signed) the names of the grantees of each parcel of property as well as directions concerning her will. (3) Mrs. Hogart, a registered nurse, was present immediately after the deeds were signed and she expressed the opinion that Margaret's memory was good and "she knew what she was doing." (4) Charlie, Steve, and Myrtle all denied making any request of Margaret to make the deeds, and (5) there was convincing testimony from thirteen relatives, neighbors, and friends that Margaret was of sound mind at or near the time the deeds were made.

There was no direct evidence of undue influence and we do not think the circumstantial evidence is sufficient to warrant an inference of such influence. "The mere opportunity to influence, * * * unsupported by evidence showing its actual existence, is not sufficient to invalidate a deed." Walton v. Van Camp, Mo.Sup., 283 S.W.2d 493, 502. In one of his points plaintiff says that the evidence established that a fiduciary relationship existed between Margaret and defendants and hence a presumption of undue influence arose. In considering that contention we note that the existence of such a relationship was not alleged in plaintiff's petition, and therefore the issue is not before us for review.

In considering the factual issues the cases cited in the briefs have not been of much assistance because each case must be decided upon its own facts and we seldom find two cases where the facts are substantially the same. In a number of respects the case of Cruwell v. Vaughn, Mo.Sup., 353 S.W.2d 616, tends to support the conclusions we have reached. We have examined the cases cited by plaintiff and find

that they are all distinguishable from the case at bar upon the factual situation involved.

The judgment is affirmed.

All concur.